CLAYTON O. PAYNE

*v.*

VALLEY MOTOR SALES, INCORPORATED

(No. 12136)

Submitted January 24, 1962. Decided March 27, 1962.

1064

*Lively, Light & Francis, William T. Lively, Jr.,* for plaintiff in error.

*Kay, Casto & Chaney, John S. Haight,* for defendant in error.

BERRY, JUDGE:

On October 9, 1961, this Court granted a writ of error to a judgment of the Circuit Court of Kanawha County of September 8, 1961, which reversed and set aside a $1768.18 judgment of the Common Pleas Court of Kanawha County in favor of the plaintiff, Clayton O. Payne, against the defendant, the Valley Motor Sales, Inc.

This case involves a point of law not heretofore directly considered by this Court dealing with the effect of an express warranty given by an automobile dealer limiting the damages recoverable under such warranty and specifically excluding all other warranties, either express or implied. The Circuit Court held that the plaintiff had elected to proceed upon implied warranty, and that the express warranty excluded all implied warranties and limited the damages to replacement of defective parts.

On or about May 31, 1957, Clayton O. Payne purchased from the Valley Motor Sales, Inc. a new 1957 F-250 Ford three-quarter ton pickup truck on which the dealer issued a specific warranty on the back of a

purchase order signed by the plaintiff, in the form commonly used by automobile dealers in the following words:

"Dealer warrants to Purchaser (except as hereinafter provided) each part of each Ford Motor Company product sold by Dealer to Purchaser to be free under normal use and service from defects in material and workmanship until such product has been driven, used or operated for a distance of four thousand (4,000) miles or for a period of ninety (90) days from the date of delivery to Purchaser, whichever event first shall occur. Dealer makes no warranty whatsoever with respect to tires or tubes. Dealer's obligation under this warranty is limited to replacement of, at Dealer's location, or credit for, such parts as shall be returned to Dealer with transportation charges prepaid and shall be acknowledged by Dealer to be defective. This warranty shall not apply to any Ford Motor Company product that has been subject to misuse, negligence or accident or in which parts not made or supplied by Ford Motor Company are used, if, in the sole judgment of Dealer such use affects its performance, stability or reliability, or which shall have been altered or repaired outside of Dealer's place of business in a manner which, in the sole judgment of Dealer, affects its performance, stability or reliability. This warranty is expressly in lieu of all other warranties, express or implied, and of all other obligations or liabilities on the part of Dealer, except such obligation or liability as Dealer may assume by its Authorized Ford Dealer's Service Policy or separate written instrument. * * *"

An accident involving the Ford truck occurred on Route 119, two miles above Clendenin, West Virginia, when plaintiff and a friend, Mark Brown, were returning from a frog-hunting expedition on June 9, 1957, at about 1 o'clock a.m. Their testimony was to the effect that it "seemed like" something hit the right side of the truck and it suddenly began to shimmy, make a noise and travel erratically, with these manifestations coming, as near as they could tell, from the right rear of the truck. It then struck a car parked on the left berm and a utility pole which the plaintiff stated was on the left of the road, although Brown, who was

in the truck with the plaintiff, testified that the pole they struck was on the right of the road. The truck went over a five foot embankment on the left of the road and downhill 40 feet into a meadow, where it came to rest about 15 feet below the road surface. Personal injuries were not sustained, but the front of the truck was damaged to such extent that it was sold for $650.00, the salvage value, and the plaintiff bought a new one. The damages to the truck amounted to $1768.18, the difference between its original cost and its salvage value.

The wheel on the plaintiff's truck consisted of a center with four projections, called a disc, in the form of a Maltese cross, which was pressed into a circular rim on which the tire is mounted. During the manufacturing process a press forces portions of the rim from the outer circumference into three holes in each of the four projections, making 12 points at which the disc and rim lock together by what are called "extruded rivets". Examination of one wheel of the truck after the accident showed that the tire and rim were separated from the disc. The driver, occupant, and a tow-truck driver all testified that the broken wheel was on the right rear of the truck.

Plaintiff's theory of the case was that the rim and disc came apart and caused him to wreck. In order to do so, the extruded rivets had to be partially sheared at their extreme ends and the wheel introduced as an exhibit shows this condition. He contends that this constituted a defect covered by the warranty, and warrantor would be responsible for all consequential damages. Defendant on the other hand contends that the wheel was not defective, or if it was, all the warrantor owes is for a new wheel. Plaintiff takes the alternative position that if the express warranty does not cover it, there is an implied one that does. Plaintiff did not introduce any evidence by an expert as to why the wheel came apart. He merely showed that the accident happened and he was damaged.

Defendant introduced only one witness, a quality control engineer of the Ford Motor Company named Robert Riding, who testified in connection with photographs, measurements, examinations and physical facts. His evidence was as follows: The company had conducted experiments and found that a force of 4,000 pounds was required to separate a tubeless tire from the rim, and still more force would be required coming from the side against a portion of the rim to separate the rim from the disc. This force cannot be easily applied running straight, but may come if a vehicle is suddenly turned sideways at high speed so that the force applied to the bottoms of the wheels results from a sideways skid; and even this will not do it unless there is something of loose consistency at the bottom of the wheel, such as dirt or gravel that will pile up and resist the skid. For any loosening of the rim from the disc, two of the four projections (spokes) would have to be loose. If a rim and tire came off while the vehicle was on the highway, the brake drum would hit the highway and produce damage visible on the drum.

The expert testified that separation of the tire and marks thereon showed some external forced applied, that there was no evidence in the right rear fender well that a tire had been loose there, that such rubbing marks were visible in the right front fender well, that no brake drum damage was evident, that the whole front-end suspension had been moved over to the left by a blow from the right, that the right front spindle on which the wheel turns had been bent down 1/4 inch, indicating a blow on the bottom of the wheel.

The expert thereupon testified that the defective wheel must have been on the right front, not the right rear of the truck. Furthermore, he stated, the rim is pressed in and the rivets extruded before painting, so that paint could not get into the joints unless there was looseness and the wheel showed no paint had penetrated between the disc and the rim and around the rivets; that had the rim come loose during travel, the rivets would wear, which they had not done. The

conclusions reasonably following from his evidence are that the wheel was solidly put together and became separated as the result of an external blow, not an internal defect.

The photographs and wheel assembly introduced as exhibits confirm the testimony of the expert. Also, the steel rim shows that a segment was knocked out of it about 1/2 inch deep and 3/8 inch wide, indicating that it had received a severe blow.

The wheel disc did not become disengaged from the hub or axle. The tire and rim were introduced as Plaintiff's Exhibit No. 3, and the wheel disc was introduced as Plaintiff's Exhibit No. 4. The disc was sprung, indicating that it had been subjected to considerable force.

Plaintiff's assignments of error in this Court raise the following questions: (1) Can both express and implied warranties exist as to the same defect? (2) Does the express warranty cover consequential damages?

Error was cross-assigned in this Court by the defendant that the plaintiff failed to prove a breach of warranty.

A suit on a warranty may be either in assumpsit or tort under the old forms of pleadings which were in effect at the time this case was brought and tried, and a count for deceit was sometimes added to the tort action. *Steel v. American Oil Development Co.*, 80 W. Va. 206, 92 S. E. 410, L. R. A. 1917 E. 975; *Schaffner v. National Supply Co.*, 80 W. Va. 111, 92 S. E. 580; *Burgess v. Sanitary Meat Market*, 121 W. Va. 605, 5 S. E. 2d 785.

A question has been raised in the instant case in connection with the Circuit Court's decision as to whether the defendant was proceeding under the theory of an express warranty or on an implied warranty, or on both. Under the old rules of procedure the same pleading could support both theories. The form

of the declaration was that the defendant "undertook and promised". The same allegations could allow proof of either an express or implied warranty and in fact the same evidence could support both types of warranty. *Wolf v. Spence*, 39 W. Va. 491, 20 S. E. 610; *Bishop v. Wheeling Mold and Foundry Co.*, 82 W. Va. 637, 96 S. E. 1020; 16 M. J., Sales, §103. Regardless of the argument that has arisen in this case concerning what type of warranty the pleadings covered, it would seem immaterial under the above authorities, and the main question involved relates to whether as a matter of law both types of warranties existed in the situation presented in the case at bar.

The West Virginia case of *Schaffner v. National Supply Co., supra,* contains a lengthy discussion of the types of implied warranties and states that an implied warranty of fitness arises when the buyer tells the seller the purpose to which he intends to apply the goods, orders the goods from the seller and leaves it up to the judgment of the seller to select the goods to meet the requirements. However, if a seller contracts for sale of an article by a particular description there is an implied warranty that the goods furnished will correspond with that description. Apparently the warranty referred to therein as "description" is for all practical purposes equivalent to the warranty classified by the text writers as that of merchantability.

In the absence of a special agreement with reference to limitation of damages in a warranty breach suit, the plaintiff may recover the difference between the actual value of the item he received and the value that it would have had if it had been as warranted, and in addition, he may recover such additional loss as is the direct consequence of the breach of the warranty. The jury may consider evidence of witnesses who saw the item shortly after its delivery and evidence as to how it performed during use; and a skilled mechanic, familiar with an automobile of a particular make, can testify about its value after making an examination of it or parts thereof. *Schaffner v. National Supply Co.,*

*supra; Foutty v. Chalmax Sales Co.*, 99 W. Va. 300, 128 S. E. 389; *Morgan Lumber & Mfg. Company v. Mc-Daniels and Landis*, 101 W. Va. 87, 131 S. E. 879; 16 M. J., Sales, §101; 77 C.J.S., Sales, §366.d.

The *Schaffner* case is one where tubing not suitable for the purpose was sold to a person drilling an oil well, and the damages recovered included the cost of a new oil well where the old one was lost by use of the tubing, and included the expense incurred in trying to save the well, all of which was considered direct consequence of the breach of warranty on the tubing.

In the *Foutty* case a breach of warranty arose when the defendant delivered to the plaintiff a 1920 Maxwell automobile which did not work properly but the defendant had contracted to sell to the plaintiff a 1921 model. The defendant desired to rectify the workmanship defect with a new engine which the plaintiff refused to take. In a suit on the warranty, it was held that the plaintiff could recover the difference between the price paid and the actual value of the car delivered.

This brings us to the main point of law in the instant case, which is, whether the warranty taken by Payne excluded any implied warranties and removed him from the general rule as to damages recoverable.

It must be recognized immediately that there are two distinct and conflicting lines of authority on this question. One line of authority, which has largely arisen within the last few years, holds that the warranty of the type involved in the present case, which has been in general use by automobile dealers and manufacturers since perhaps the early 1920's, is so unfair to the purchaser that as a matter of public policy no effect will be given to many of its provisions, including the provision which eliminates all implied warranties and the provision which eliminates any chance of securing damages greater than those measured by the value of the defective part.

The leading case on the public policy theory is a 1960 case of *Henningsen v. Bloomfield Motors Inc. and Chrysler Corp.,* 161 A. 2d 69, 32 N. J. 358. In that case the plaintiffs, who were husband and wife, brought suit jointly for breach of express and implied warranties against both the dealer and the manufacturer when a Plymouth car, ten days after purchase with 408 miles on the speedometer, suddenly left a level, wide highway and crashed into a brick wall while the wife was driving. She claimed damages for personal injuries, and the husband sought damages for the automobile itself, medical and hospital expense of his wife and loss of his wife's society and services. The testimony of the wife was that there was a loud noise under the hood, the steering wheel spun in her hands and the car veered to the right, injuring her and causing almost total loss of the car. An expert who was an appraiser of damaged cars for an insurance company testified that something definitely went "wrong from the steering wheel down to the front wheels", and that a mechanical defect must have caused the wreck as "something down there had to drop off or break loose to cause the car" to act in such manner. There was no evidence or anything to suggest that any external force was connected with the alleged defect, either as an inducing or concurring factor. New Jersey has in force the Uniform Sales Act as part of the statute law of that State.

Another example of the public policy cases is that of *General Motors Company v. Dotson,* (Tenn.), 338 S. W. 2d 655, which was decided in 1960. The car in that case was an Oldsmobile which plunged into a ditch because of defective brakes, after numerous complaints by the purchaser and efforts of the dealer to fix them. The usual automobile warranty was in effect. Evidence of defective brakes was clear because General Motors had admitted this as to that particular year of 1954 on certain earlier models in a bulletin sent to the dealer. The Court held that there existed an implied warranty of merchantability under the uniform Sales Act, which had been adopted and made part of the statute

law in Tennessee. The Court stated that the implied warranty was not inconsistent with the express warranty under the Uniform Sales Act.

A third case based on public policy is *State Farm Mut. Ins. Co. v. Anderson-Weber, Inc.,* (Iowa) 110 N. W. 2d 449, in which a new Mercury automobile caught fire under the hood after being driven 300 miles, and there was testimony by a witness for the plaintiff that the fire was caused by a defect in the wiring. The defendants tried to show that the fire might have arisen from adulterated gasoline. Iowa had also adopted the Uniform Sales Act. Accordingly, the Court held that the usual express automobile warranty did not exclude an implied warranty, so recovery was allowed. The Court remarked that the case was squarely on warranty, and that the case should go to the jury on circumstantial evidence.

In contrast to the somewhat limited number of cases holding the automobile dealer's and manufacturer's express warranty to be void in limitations of damages and in the exclusion of implied warranties, the number of cases holding that strict effect is to be given to the terms of an express warranty excluding implied warranties or limiting recoverable damages is legion, and some of these cases, although recognizing the inequalities of the situation from the buyer's standpoint, have remarked that correction of the evil is a legislative, not a judicial duty.

It has been generally stated in the majority view that an express warranty may arise from an oral or written affirmation of the quality of the vehicle (as distinguished from a mere expression of opinion) made to induce the buyer, and in fact inducing him, to purchase, but that the measure of the responsibility of the seller on an express warranty is limited to the actual terms of that warranty. 77 C. J. S., Sales, §330.e, Motor Vehicles; 34 A. L. R., Annotation, 535, supplemented by 43 A. L. R. 648; 75 A. L. R., Annotation, 1032, supplemented by 127 A. L. R. 132, 160, and further supple-

mented by 133 A. L. R. 1360, 1364; *Minneapolis Threshing Mach. Co. v. Hocking,* 54 N. D. 559, 209 N. W. 996; *Tharp v. Allis-Chalmers Mfg. Co.,* 42 N. M. 443, 81 P. 2d 703, 117 A.L.R. 1344; *Bekkevold v. Potts,* 173 Minn. 87, 216 N. W. 790, 59 A. L. R. 1164, (which states that all implied warranties may be easily excluded by the simple method of saying so in the contract); *Deere and Webber Co. v. Moch,* 71 N. D. 649, 3 N. W. 2d 471, 139 A. L. R. 1270; *Ford Motor Co. v. Switzer,* 140 Va. 383, 125 S. E. 209.

Many of the majority line of cases have held as a matter of law that the giving of an express warranty excludes the existence of all implied warranties, except that of title, whether the express warranty says that it so excludes them or not. However, the so-called "liberal rule", adopted in this State, is that the implied warranties are not excluded where an express warranty exists if they are not inconsistent with the express warranty. *Hill & Gain v. Montgomery Ward,* 121 W. Va. 554, 4 S. E. 2d 793; *Greenland Development Corp. v. Allied Heating Products Co.,* 184 Va. 588, 35 S. E. 2d 801, 164 A. L. R. 1312. In the *Hill & Gain* case the plaintiffs bought an oil burning refrigerator which had a guarantee bond that said buyer could return the refrigerator if it failed to work satisfactorily. This Court held that the liability was limited under that bond to allowing the return of the item, even though the plaintiff sought damages because the refrigerator had set his store on fire, and the court specifically said that an express warranty did not exclude implied warranties unless inconsistent therewith, which they term "the more liberal rule." The Virginia Court, in the *Greenland Development* case, adopted the West Virginia rule and held that both an express warranty and an implied warranty could co-exist if not inconsistent.

While recognizing the distinct split of authority on this question of whether an express warranty excludes implied warranties, we feel that on the basis of the recognized right of parties to contract and to have such contracts upheld by a court, and on the basis of

decided West Virginia cases, such as the *Hill & Gain* case, and on the basis of following the majority rule in this country, effect should be given to the actual words of the express warranty, and if such words exclude implied warranties of every type and limit the liability of the seller or manufacturer who gave the warranty, then it must necessarily follow that a plaintiff who has accepted such warranty cannot recover except under the terms thereof. Furthermore, we are of the opinion that the general rule of allowing consequential damages does not apply in the instant case, because, as we have held herein, the purchaser is bound by the warranty given and accepted; and this warranty specifically limits his recovery to replacement of defective parts and items caused by defective workmanship. The written warranty of the type involved here is a matter for the court to construe and then to properly instruct the jury. *Cannon v. Pulliam Motor Co.*, 230 S. C. 131, 94 S. E. 2d 397.

A case may be proved by circumstantial evidence as well as by direct evidence. *Webb v. Harrison*, 127 W. Va. 124, 31 S. E. 2d 686. However, there can be no recovery by a plaintiff without proving the cause of the accident. *Webb v. Harrison, supra; State Farm Mut. Auto Ins. Co. v. Anderson-Weber, Inc., supra*. The jury must not be left to guess the nature of the defect and to determine the cause of the accident therefrom. *Blythe v. Camp Manufacturing Co.*, 183 Va. 432, 32 S. E. 2d 659.

The burden of proof in a warranty case is on the buyer to prove a warranty, a breach, and damages. *Southern Box and Lumber Co. v. Home Chair Co.*, 250 N. C. 71, 108 S. E. 2d 70.

Applying these principles to the instant case, we observe that although a defect constituting a breach of the warranty was alleged by the plaintiff, the only evidence which bears on the question of whether the wheel might have been a defective one to begin with, was the testimony of Oral Ashley, the wrecker driver

who removed the wrecked truck, as follows: "Q. Have you ever seen this type of disengagement before? A. Never yet." On the other hand, the testimony of the witness for the defendant, Robert Riding, quality control engineer for the Ford Motor Company, showed beyond doubt that the wheel bore no evidence of being defectively assembled. This evidence of the defendant is uncontradicted, although there is, of course, a conflict as to which position on the truck the wheel occupied, an immaterial matter if the wheel was not defective. Furthermore, the evidence shows that the wheel received a severe blow.

It should be observed that in the three cases from New Jersey, Iowa and Tennessee, cited above, holding that the customary express automobile warranty was against public policy in certain particulars, the plaintiff in each case clearly proved a defect existed by the fact that there had been no external force present, by experts who testified that the accident could not have happened without the defect, and by the fact in one case that the dealer knew of the defect.

We conclude therefore that the plaintiff did not sufficiently bear the burden of proof in the case as tried by showing that a defect existed prior to the accident and became the cause thereof, which is necessary before recovery would be allowed, even in the cases based on public policy. It should also be pointed out that the Uniform Sales Act had been adopted and was part of the statute law of the states wherein the doctrine of public policy was used in connection with allowing implied warranties to be considered. The Uniform Sales Act, being a part of the statute law in those states, had specific provisions pertaining to implied warranties, and liberalized the law pertaining thereto. The Uniform Sales Act has not been adopted by the legislature in this State and we have no statutory provisions with regard to implied warranties wherein they could come within the principle that they were a "child of the law" in this connection as used and applied in the cases referred to herein allowing recovery based on public

policy. *Henningsen v. Bloomfield Motors Inc. and Chrysler Corp., supra; General Motors Company v. Dotson, supra; State Farm Mut. Ins. Co. v. Anderson-Weber Inc., supra.*

For the reasons stated herein, the judgment of the Circuit Court of Kanawha County, which reversed the judgment of the Court of Common Pleas of Kanawha County for the sum of $1768.18 in favor of the plaintiff, set aside the verdict supporting such judgment and awarded a new trial to the defendant, is affirmed.

*Affirmed.*