## HENRY HOFSTEDT v. INTERNATIONAL HARVESTER COMPANY AND ANOTHER.

98 N. W. (2d) 808.

October 23, 1959—No. 37,747.

*I. L. Swanson,* for appellant.

*Robert Gislason* and *Cummins, Cummins, Hammond, Cummins & O'Brien,* for respondent.

KNUTSON, JUSTICE.

This is an appeal from an order denying plaintiff's motion for a new trial.

Defendant International Harvester Company is a corporation engaged in the manufacture and sale of farm implements, including tractors. Defendant Traverse Implements, Inc., is a corporation engaged in a retail implement business at Wheaton, Minnesota, and is a sales agent for implements manufactured by International Harvester Company.

Plaintiff is a farmer living in Traverse County in this state. On or about June 27, 1956, Traverse Implements, Inc., sold to Hjalmer Hofstedt, a brother of plaintiff, a 400 Series Farmall tractor. Plaintiff and his brother live together in the same household. They operate separate farms but work together and own most of their machinery together as a partnership. Hjalmer owned the Farmall tractor individually. The tractor sold to Hjalmer was equipped with an independent power takeoff used to operate machinery attached to the tractor. An independent power takeoff is distinguished from other power takeoffs in that the power transmitted to the shaft to which machinery is attached can be shut off without stopping the forward motion of the tractor. In other words, the power takeoff can be operated independently of the mechanism that propels the tractor itself. Hjalmer had owned other tractors with power takeoffs, but this was the first one he had owned having an independent power takeoff. While a detailed description of the power takeoff is unnecessary for the purpose of this decision, a general understanding of the manner in which it operates may be enlightening.

The power takeoff consists substantially of a transmission consisting of a planetary gear system involving a ring gear attached to the crank-

shaft of the engine which revolves at all times when the engine is operating and a system of planetary gears and a so-called sun gear which is attached to the drive shaft protruding from the rear of the tractor to which implements to be driven by the power takeoff are attached and operated. The drive shaft is activated or held in a stationary position by two brake bands which operate on steel drums within the transmission much the same as the brakes on an automobile. These two brake bands are so constructed that they are tightened or loosened by means of a lever operating on a teeter-totter lever in such a way that when one band is tightened the other is loosened. They are referred to as the operating drum and the anticreep drum. The tension on the bands is regulated by two adjusting screws. The operating lever is located on the right-hand side of the tractor and is in a disengaged position when pushed forward and in an engaged position when pulled backward. In other words, the power takeoff is activated when the lever is pulled backward and stopped when the lever is pushed forward.

After the tractor was sold to Hjalmer Hofstedt, it was inspected by Traverse Implements, Inc., and found to be working properly. The inspection included the power takeoff.

The power takeoff was first used on August 6, 1956, when Hjalmer began to harvest some oats. The crop was heavy, and the ground was wet on the day the harvesting began. A swather—an implement consisting of a sickle bar which cuts the grain and a revolving endless apron which moves the grain to one end of the machine and deposits it on the ground in rows—was attached to the tractor and the power takeoff. There was no difficulty in making the attachment, the power takeoff control lever being placed in a disengaged position, and during the operation the power takeoff did not revolve.

The power from the tractor was used on this implement only for the purpose of driving the sickle bar. The rest of the swather was operated from power derived from the wheels on the implement itself. Power from the tractor takeoff turned a V-belt pulley at the end of a shaft which was attached to the power takeoff. A V-belt connected this pulley with another pulley which in turn operated the sickle through means of a Pitman rod attached in an offset manner to the

latter pulley. This V-belt was used not only to cut down the speed of the sickle but also as a safety slip clutch. If the sickle became clogged the belt would slip. Such a belt requires tightening from time to time because of wear and the stretching of the belt. If the belt becomes too loose it will slip unnecessarily.

As Hjalmer began to cut the oats, he tested the power takeoff and it worked properly. While Hjalmer drove the tractor, plaintiff walked behind the swather in order to determine whether it was too wet to proceed with the operation. Three times the sickle bar became clogged and the sickle stopped cutting. When the sickle became clogged, Hjalmer stopped the forward motion of the tractor, leaving the power takeoff in an engaged position, and the sickle would start up again. The fourth time the sickle stopped, Hjalmer stopped the tractor, but this time the sickle did not start. Plaintiff then came around the swather, took hold of the V-belt mentioned above, and as he did so it moved, drawing his hand between the belt and the pulley, as the result of which he sustained the injuries for which he now sues to recover. Hjalmer claims that when he stopped the tractor, and before plaintiff touched the V-belt, he placed the power takeoff control lever in a disengaged position. In a pretrial deposition he stated that he pulled the lever back, which would have placed the lever in an engaged position, but at the time of the trial he stated that he pushed the lever forward.

The power takeoff on the tractor was next used in September 1956. At that time it was attached to a two-row cornpicker. Hjalmer had no trouble in hooking up the cornpicker to the power takeoff. In the operation of a cornpicker the power transmitted by the tractor from the power takeoff activates the entire machinery. This being a heavy piece of machinery, it requires considerable power for its operation. Everything worked normally except that after he had operated the machine about 60 rods in a heavy stand of corn he began to have some slippage due to the fact that the band around the operating drum in the power takeoff mechanism was too loose. This was the opposite maladjustment from one which would cause the power takeoff to "creep" if the control lever was in a disengaged position. Hjalmer

then disconnected the cornpicker, took the tractor to Wheaton where the brake drums were adjusted by a mechanic employed by Traverse Implements, Inc., and thereafter he had no further difficulty with it. At no time has Hjalmer or plaintiff observed the power takeoff move when the control lever was in a disengaged position, except that they claimed that it moved at the time when plaintiff was injured.

On April 4, 1958, nearly 2 years after this accident occurred, the power takeoff assembly was dismantled by one B. J. Robertson, who was professor of mechanical engineering at the University of Minnesota. His field of teaching was mainly confined to that involving internal combustion engines. He also had considerable experience as a consulting engineer, and at the time of the trial he was engaged in working for Minneapolis-Honeywell Regulator Company in advising young, inexperienced engineers in mechanical engineering. At the trial he was called as an expert witness by plaintiff. He testified that at the time he examined the power takeoff mechanism he found two spots on the anticreep brake band which were about one sixty-fourth of an inch thinner than elsewhere, located about 60 degrees from the center of the band. Over objections of defendants as to foundation, he was permitted to state an opinion on the assurance of plaintiff's counsel that he would connect up the condition found in 1958 with the condition of the tractor when sold. It was his opinion that the wear on the brake band indicated an imperfect contact between the band and drum which might have caused the power takeoff to revolve when in a disengaged position at the time plaintiff touched the V-belt on the swather.

By stipulation of counsel, the liability of International Harvester Company was litigated entirely on a basis of negligence in the manufacture of the power takeoff. At the close of plaintiff's case, the trial court struck the testimony of Robertson on the ground that plaintiff had failed to lay a sufficient foundation for his opinion and thereafter granted defendant International Harvester Company's motion for a dismissal on the ground that, aside from the opinion of Robertson, there was no evidence of negligence which could establish liability against International Harvester Company.

Plaintiff presents two questions for our consideration; namely (1) that the court erred in striking the testimony of the witness Robertson after the witness had been excused, and (2) that the evidence was such that the court was not justified in striking the testimony of Robertson and granting a dismissal of the case.

■ It is apparently plaintiff's contention that after the trial court had permitted Robertson to testify and to state his opinion it was too late to strike his testimony. Plaintiff ignores the fact that Robertson was permitted to proceed upon the assurance of plaintiff's counsel that a sufficient foundation would be supplied later. With respect to defendants' objections and the court's action thereon, the following appears from the record:

"Mr. Lundquist: Just a minute, Professor. This is objected to, your Honor, upon the grounds it's incompetent, irrelevant and immaterial, too remote in time and place from the time of this accident.

"Mr. Gislason: We join in the objection.

"Mr. Swanson: We'll connect it up. This is preliminary.

"The Court: Very well, overruled.

"Mr. Lundquist: May we have a standing line of objections, your Honor, until there is some foundation for this testimony?

"The Court: Well, counsel assures the Court that is preliminary and that he'll connect it up. If it isn't connected up, this testimony will have to go out."

When Robertson was asked for his opinion as to what caused the condition of the brake band which he testified he found, objection was made to his opinion, and the following transpired:

"Mr. Swanson: Well, he is qualified as an expert, your Honor, and as I say, there will be additional testimony that will relate back to it. I might say the time that the tractor was originally sold with relation to this particular thinness of the band—

"The Court: Of course, it is too remote in time unless you can connect it up.

"Mr. Swanson: I believe that is right, but we'll connect it up."

Later in the questioning of Robertson, the following occurred:

"The Court: Well, the Court agrees with you, counsel, that this testimony would be, standing by itself, too remote. And the Court is also aware of the fact that in the case so far, there is testimony that there was an adjustment made after the alleged injury. Now, are we able to connect that up with this testimony? Do you feel that we can? Otherwise, of course, unless you can make reasonable connection, then all this testimony will have to be stricken.

"Mr. Swanson: That is right. We'll connect that up.

"The Court: With that understanding, you may answer the question."

Apparently plaintiff now contends that since he was permitted to proceed without adequate foundation upon his assurance to provide it later the court must permit the testimony to stand, even though plaintiff has failed to do that which he assured the court he would do. We see no merit to this contention. Undoubtedly it would be better practice to require the laying of a proper foundation before an opinion is admitted, except in those exceptional cases where there is good reason for proceeding otherwise, but plaintiff, who has availed himself of the court's liberality in permitting the opinion to come first, is hardly in a position to complain when the testimony is stricken as a result of his failure to do that which he had assured the court he would do.

We have examined the cases relied upon by plaintiff and fail to see how they sustain his position. They involve, for the most part, cases in which no objection was made to the testimony until after it had been admitted. No purpose would be served in discussing them further. Here, the objection was interposed from the beginning, and plaintiff was permitted to proceed only as a result of his assurance that sufficient foundation would later be supplied. Plaintiff understood from the beginning that the testimony would be stricken if he failed to connect it up with the occurrence of the accident. He failed to do that, and the court did only that which plaintiff understood from the beginning would be done if the required foundation was not forthcoming.

■ Plaintiff next contends that the evidence was such that the trial court erred in striking it in any event. The opinion of Robertson was

based upon an examination of the power takeoff made in April 1958. In the interval between the date of the accident on August 6, 1956, and the time of Robertson's examination in 1958, the tractor, including the power takeoff, had been in general use on Hofstedt's farm. The testimony of Robertson as to how long it would take to develop the worn spots which he found was as follows:

"* * * You could only tell the length of time by testing the same material. Really, I couldn't tell you how many years it would take this thing to take place, or how much wear would occur. The wear may still be occurring for all that I know."

He testified that if the brake bands were properly adjusted the power takeoff could not move when the control lever was in a disengaged position. The evidence showed that the bands had been adjusted by Traverse Implements, Inc., after the tractor had been delivered to Hofstedt and before Robertson had made his examination. There was no showing that the bands were not adjusted properly when the tractor was delivered by International Harvester Company.

Robertson further testified that if the sickle bar was clogged with oats it would be impossible for the power takeoff to "creep." He had never before seen the inside of such mechanism. He had no quarrel with the design of the power takeoff. His testimony in that respect was:

"Q. You have no criticism of the engineering principles of this unit?

"A. No."

Under the laws of this state a manufacturer of a chattel may become liable to those who use the chattel if it fails to exercise reasonable care in the design thereof or in the use of material suitable for the purpose for which it is intended[1] or if it negligently assembles the chattel. However, before liability may attach on the ground of negligence in the assembly of the chattel, it must appear that the alleged defect existed at the time the chattel was sold and delivered by the

---

[1]Lovejoy v. Minneapolis-Moline Power Imp. Co. 248 Minn. 319, 79 N. W. (2d) 688.

manufacturer. Here, even plaintiff's expert had no quarrel with the design of the power takeoff. There is no claim that unsuitable material was negligently used. There is a complete absence of evidence that any defect in the assembly which Robertson claims to have found in 1958 existed when the tractor was sold to Hofstedt in 1956. The manufacturer was under no obligation to keep the power takeoff adjusted after delivery. Between the date of the accident and the examination by Robertson, the tractor had not only been used extensively but the power takeoff had been adjusted by Traverse Implements, Inc. Under these circumstances, clearly the court was correct in holding that the testimony of Robertson was insufficient to support a recovery. There was no other evidence upon which to base a finding of negligence. It must follow that the dismissal was proper.

In passing it might be said that, even though it may be admitted that Robertson was well qualified as an expert in the general field of mechanical engineering, it does not follow that he was qualified to reconstruct this accident and to substitute his opinion for pertinent evidence establishing the basic facts of negligence. The opinion of an expert is intended to assist the jury, or court, in understanding the evidence and in drawing the proper inferences from it. It is not intended to supplant evidence required to establish the basic facts.

We find no reversible error.

Affirmed.