CLIFTON GRANT v. MALKERSON SALES,
INC., AND ANOTHER.
GENERAL MOTORS CORPORATION, APPELLANT.

108 N. W. (2d) 347.

February 17, 1961—No. 37,911.

*Danforth, Howard & Allen,* for appellant.

*Tyrrell, Jardine, Logan & O'Brien,* for respondent Malkerson Sales, Inc.

*Bruce B. James,* for respondent Grant.

FRANK T. GALLAGHER, JUSTICE.

Appeal from an order of the district court denying a motion by General Motors Corporation, one of the defendants, for judgment notwithstanding the verdict or in the alternative for a new trial.

On May 16, 1957, plaintiff purchased and took delivery of a 1957 Oldsmobile Super 88 from Malkerson Sales, Inc., hereinafter referred to as Malkerson. He claims that on the evening of May 19, 1957, in Minneapolis, after the car had been driven about 350 miles, and while he was stopped at an intersection awaiting a signal change, the engine

suddenly accelerated; that the car moved forward gaining speed rapidly up to 90 miles per hour; that attempts on his part to stop the automobile by braking, shifting, and turning off the ignition were unsuccessful; and that it traveled many blocks along the city streets before it stopped. As a result of this experience, he claims to have sustained injuries.

He brought suit for damages against Malkerson and General Motors Corporation, hereinafter referred to as General Motors, the manufacturer of the Oldsmobile.

The jury returned a verdict for plaintiff against defendant General Motors and for defendant Malkerson. The amount of the verdict is not in issue on this appeal. The only issue raised by General Motors is whether the evidence is sufficient to support the verdict against it.

The record shows that the automobile was manufactured by the Oldsmobile Division of General Motors in Kansas City and was delivered to Malkerson on April 9, 1957.

Clarence Brose, one of Malkerson's mechanics, after referring to his records, testified that he performed the customary predelivery inspection on the automobile on April 15, 1957, at Malkerson's place of business in Minneapolis and that after his inspection he placed the car on one of its outside lots.

It appears that the car remained there until May 16, 1957, when plaintiff bought it. After washing the car, Malkerson delivered it on that date to plaintiff, who drove it to work and other places until the May 19 incident. He claims that during the time he operated the car from the date of delivery to Sunday night, May 19, he drove it about 40 to 45 miles per hour, and that it was not serviced except that he frequently purchased gasoline. He further said that the hood never was raised or anything done to the engine while he had the car in his possession.

Plaintiff testified that on May 19, 1957, he arrived in Minneapolis, with his mother, between 10:30 and 11 p. m. on their return from Rochester, Minnesota, where they had gone from Minneapolis that morning. As he was driving west on 38th Street, he came to a stop at a red signal at Chicago Avenue. He said that while they were waiting for the signal to change "all of a sudden" the Oldsmobile "took off

and jerked us back." He claims that he put on the brakes, as well as the emergency brake, and turned off the ignition; that by that time he was going about 90 miles per hour; that he pulled over into the left lane to avoid hitting traffic ahead of him and went between cars that were facing him; but that his automobile just kept on going.

At 4th Avenue he said that he tried to turn north to avoid hitting two busses, sideswiped a car, and straightened out his own vehicle as he went north on 4th Avenue. During this time he said he kept his foot on the brakes, which were power brakes; and that he did not have his foot on the accelerator at any time after he left 38th Street and Chicago Avenue, not even when the car first started to move.

As he turned the corner at 4th Avenue after sideswiping the car, he claimed that he was thrown into the left door of his car; that his kneecap hit the door knob and he was helpless from then on; that he held on to the wheel the best he could, "wobbling up and down 4th Avenue." He said that he went through eight red lights and two stop signs. When the car got to 26th Street and 4th Avenue, it began to slow down a little and came to a stop around 24th Street and 4th Avenue. He did not recall what happened after it came to a stop as he was in a somewhat dazed condition except he could see that the front and rear ends were "on fire"; that a tire exploded; and that water was "gushing up from the radiator." He said he had driven cars for some 20 years prior to this incident.

John Toomey, a witness for plaintiff, who said he was a mechanic with 20 years' experience, was closing his service station at 3351 4th Avenue South when he saw plaintiff's car going north on 4th Avenue. Toomey noticed "sparks and fire" and heard some noise from the automobile as it went by at a speed he estimated to be between 60 and 70 miles per hour. He said it left a cloud as it passed by but he could not tell whether it was smoke or steam. The witness said that he locked up his gas station and headed north on 4th Avenue in the direction the car was going. As he got to about 24th Street, where he saw people running towards plaintiff's car, he pulled over and stopped at a side street and went back to see what happened. He observed smoke coming up around the car from the wheels and that the brakes had been used to the point that the paint on the wheels had turned

brown. He said that about that time the rear tire blew and that someone was loosening the radiator cap.

On direct examination he testified that an inspection of the car made by him shortly after he arrived disclosed that there was no cotter pin in the bell crank; that the spring washer and heal washer were missing from the bell crank pivot pin; and that the bell crank "had dropped off, stood off halfway that way [indicating]. That brought it out in a position where it could hang up after it accelerates."

At another place in the record he testified that as he and others at the scene looked over the car, "there was a fireman put a light in on the car and then we see this bellcrank that fastens onto the shaft that goes—that is screwed into the carburetor, that had dropped down and hung up on the sparkplug bracket sparkplug wire bracket." He said that in this hung-up position the accelerator was stuck substantially at full throttle or open.

Defendant General Motors calls our attention to certain conflicts in Toomey's testimony, for example, on cross-examination he admitted he looked at the carburetor area for no longer than a minute or two, that it was dark, that he could not see the technical parts of the engine without a flashlight. When asked whether his only thought was that there was a cotter key and washer missing, he replied, "That's right. The shaft—the shaft wasn't visible at the time."

We deem it unnecessary to set out in detail all of the other conflicts in this testimony pointed out by General Motors. While his testimony on mechanical details may have been inconsistent in some respects, it is our opinion that such inconsistencies were matters for the jury to consider in determining the weight and credibility to be given his testimony. Ryan v. Griffin, 241 Minn. 91, 62 N. W. (2d) 504; Cameron v. Evans, 241 Minn. 200, 62 N. W. (2d) 793; Schneider v. The Texas Co. 244 Minn. 131, 69 N. W. (2d) 329.

William Stevenson, an employee of General Motors who examined plaintiff's car at Malkerson's garage the morning after the incident, testified as to the excessive use of the brakes and the loss of radiator water. Malkerson's service manager and two of its mechanics also looked at the general carburetor area of plaintiff's automobile shortly after it was brought to the garage. They agreed with Mr. Stevenson

that the bell crank was on the bell crank pivot pin, that the washer was on the bell crank pivot pin, and that the cotter key was in the end of the bell crank pivot pin, but that the bell crank pivot pin or shaft was unscrewed from the carburetor. When asked on direct examination what the position of the accelerator was, Mr. Stevenson replied, "A good three-quarters open."

In any event it was conceded by General Motors on oral argument before this court that on the morning after the incident an inspection of the Oldsmobile disclosed that the bell crank pivot pin and the whole assembly of the accelerator linkage was out and hung-up on the spark-plug wire bracket.

Plaintiff claims that according to testimony produced in his behalf an inspection of the automobile engine immediately after the incident disclosed that certain parts of the transmission and accelerator linkage system had become dislodged from their normal position and had become locked or hung-up on the sparkplug wire bracket and that this position of the linkage opened the accelerator causing the engine to race.

Defendant Malkerson contends that the evidence indicates that the incident was caused by car malfunction, or more exactly by the auxiliary bell crank's falling down and hanging on the sparkplug bracket; that there was evidence that either the auxiliary bell crank pivot pin or the cotter pin attached to it was at fault; that no one examined or touched the motor after the car was purchased or before the accident; that Malkerson had no reason to tamper with the faulty parts unless the fault was noticed by the naked eye; that through a series of inspections by it and General Motors prior to plaintiff's purchase of the car it was established that the fault was not apparent before the car was purchased and that, therefore, the inference is that a part was assembled improperly at the plant and normal use caused it to malfunction.

Victor Greening, an employee of General Motors, testified in its behalf that he has been with the Oldsmobile Division of the company for about 13 years and was acting as a field service engineer at the time of the trial. He explained his familiarity with the actual operation of the factory and the manufacturing of 1957 Oldsmobiles. He

discussed the mechanical construction of carburetors used in the 1957 Oldsmobile Super 88s and the 25 steps during manufacture with reference to assembly, inspections, and functions that involved the bell crank pivot pin. When questioned on direct examination as to whether it was possible on a 1957 Oldsmobile Super 88 for the cotter key and washer at the head of the bell crank assembly pivot pin to become unhooked and the assembly to work out from the carburetor body a sufficient distance for it to become locked at wide open throttle on the bracket arm supporting the sparkplug wires, he replied that it was impossible the way Toomey had described it.

He was asked further:

"Q. Well, under any conditions, is there any set of circumstances that conceivably that could have happened or occurred which would have permitted the catching of the accelerator or linkage wide open on the spark plug bracket immediately opposite the carburetor? Do you understand my question now?

"A. I will have to ask you one question to clarify this. With the throttle control in the specified condition?

"Q. No, in any position.

"A. You say if anything could happen?

"Q. Is there anything that it could be put in any condition?

"A. I know of one.

"Q. Will you tell us what condition that could be?

"A. If this pivot was taken out of the carburetor and the linkage allowed to fall down, then the throttle control advanced to approximately wide open carburetor or full throttle, it is conceivable for the retainer holding the upper T. V. rod to become hooked on the spark plug bracket."

Both General Motors and Malkerson agreed that other cases are of little value as precedent where the issue on appeal is the sufficiency of the evidence to sustain the verdict. While the record here confronts us with much conflicting evidence, it is well settled that findings of fact based on conflicting evidence will not be disturbed on appeal unless manifestly and palpably contrary to the evidence as a whole, even though we might find the facts to be different if we had the

factfinding function. Loth v. Loth, 227 Minn. 387, 35 N. W. (2d) 542, 6 A. L. R. (2d) 176; First Trust Co. v. McLean, 254 Minn. 75, 93 N. W. (2d) 517.

Defendant General Motors contends, however, that the verdict against it is based upon possibility, speculation, and conjecture and is not supported by the evidence, citing Hanrahan v. Safway Steel Scaffold Co. 233 Minn. 171, 46 N. W. (2d) 243.

It further argued orally before the court that the issue involved is whether the question of possibility or inference should have been submitted to the jury inasmuch as no showing was made that the condition which was found following the incident on May 19, 1957, existed when the Oldsmobile left the factory at Kansas City on April 5, 1957.

While it is true that plaintiff produced no testimony as to the possible defective condition of the automobile when it left defendant's factory, which was more than a month prior to the date he purchased it, it appears to us that we must consider plaintiff's position in that connection. From a practical standpoint he would be faced with a serious problem if he is required to show a defect in the carburetor or accelerator linkage prior to the time the car left the factory. There is nothing in the record here which shows that plaintiff had any specific knowledge about the design or manufacture of the car he purchased. He had to rely to a great extent, as millions of car purchasers have to rely, upon the statements made to him by the manufacturer and the seller through their advertising and "sales talks" as to the construction and working parts of the car. It is common knowledge among purchasers of cars that the merits and functional operations of the automobiles are never underestimated by the salesmen or by the advertising programs regarding the particular cars which are offered for sale.

Here we have a situation where according to our record the plaintiff purchased this automobile; after he drove it for about 3 days in his usual manner, he found that it was using more gasoline than he thought it should; he brought it back to Malkerson's garage where someone in the garage told him that "it was tight, and when it loosened up it would stop using gas."

It appears to us that under the circumstances here the plaintiff is in the position of an innocent, helpless bystander, overwhelmed by the purported legal principle put forth by General Motors that if he was unable to produce proof of a defect in the car before it left the factory the loss must lie where it falls. We cannot agree with that theory under the facts and circumstances here. Rather it is our opinion that the testimony here presented a rational inference that the erratic drive described herein was caused by a car malfunction or defect which could have existed before the incident. It is our further opinion that plaintiff was entitled to have the jury pass on the issue of negligence and causation on the part of General Motors.

Affirmed.

### ON PETITION FOR REHEARING.

On April 28, 1961, the following opinion was filed:

PER CURIAM.

Defendant General Motors contends in its petition for rehearing that our opinion in the instant case is inconsistent with our decision in Hofstedt v. International Harvester Co. 256 Minn. 453, 98 N. W. (2d) 808. While the rule laid down in the Hofstedt case still prevails in this jurisdiction, we find no difficulty in distinguishing that case from the case at bar.

In the Hofstedt case the only evidence on which to base a finding of negligence on the part of the manufacturer was testimony of an expert who examined the equipment nearly 2 years after it had been sold and delivered to plaintiff's brother and about 1 year and 8 months after the accident occurred. In the period after the accident and before the inspection, the equipment had not only been used extensively but had been adjusted by the dealer. We held there that the evidence was insufficient to support a recovery against the manufacturer.

In the instant case there was testimony of a witness who examined the automobile within 3 days after it had been sold and delivered to the plaintiff and immediately after the accident. In addition there was testimony that no adjustment had been made by anyone after the sale and delivery of the car to the plaintiff and prior to the accident. It was, therefore, our opinion that the testimony presented a rational

inference that the erratic drive described in the opinion was caused by a car malfunction or defect which could have existed before the incident and that under the circumstances plaintiff was entitled to have the jury pass on the issue of negligence and causation on the part of the defendant General Motors. Our opinion in that respect has not changed.

Petition denied.