HARDWARE MUTUAL CASUALTY COMPANY
v. CHRYSLER CORPORATION.

142 N. W. (2d) 728.

May 6, 1966—No. 39,699.

88

*Cummins, Cummins & Gislason, Ronald R. Pawlak,* and *David W. Nord,* for appellant.

*Ryan, Kain, Mangan, Westphal & Kressel* and *William P. Westphal,* for respondent.

SHERAN, JUSTICE.

Appeal from an order denying defendant's motion for judgment notwithstanding the verdict or a new trial.

Hardware Mutual Casualty Company, to be called Hardware, brought action against the Chrysler Corporation for approximately $100,000 paid by it as insurer of North Side Motors, Inc., to be called North Side, to settle personal injury and death claims arising out of a head-on col-

lision between a 1951 Chrysler automobile owned by North Side and a Pontiac driven by one Hilmer Johnson. The insurer's theory was that the collision was caused by Chrysler's negligence in equipping the Chrysler automobile involved with a defective power-steering assembly, the failure of a part of which (the sector shaft) caused the accident.

After trial and a verdict in Hardware's favor, Chrysler's motion for judgment notwithstanding the verdict or a new trial was denied and so the appeal.

The issues raised make necessary a detailed recitation of the facts.

The Chrysler Imperial automobile involved bears serial No. 7751409. Manufacture of the vehicle by Chrysler, according to its records, was completed on September 24, 1951. When finally assembled, it would include a hydraguide power-steering unit obtained by Chrysler from the Gemmer Manufacturing Company, to be called Gemmer. Power-steering units so manufactured by Gemmer include a sector shaft.

On November 26, 1951, a Chrysler Imperial automobile bearing serial No. 7751409 was purchased by a Mr. Charles C. Buckland at retail from Standish-Bishop, a Minneapolis Chrysler dealer. Standish-Bishop would have obtained the vehicle from Chrysler, but the date of delivery to it is not disclosed by the record.

Mr. Buckland used the vehicle until November 29, 1954. As of that date he had traveled about 38,000 miles over a period of 3 years. He had the car serviced every 1,000 miles during the time he owned it. He had no trouble with the power-steering equipment and could recall no repairs having been made to the power-steering mechanism. Until November 29, 1954, his use of it was uneventful except for a minor rear-end accident.

On November 29, 1954, he was involved in a more serious collision when another car ran into the left side of the vehicle. Mr. Buckland testified, in describing this accident:

"* * * [B]oth doors were badly dented, and the door post was badly dented. I am not clear in my own thinking whether it got up in the left front fender or not, but the car was a shambles."

Nevertheless, Mr. Buckland was able to drive the car from the scene of

the accident without any difficulty relating to the steering mechanism and it may fairly be said that the record supports a finding that Mr. Buckland had no trouble with the power-steering equipment and could recall no repairs having been made to the power-steering mechanism while he owned it.

The next day (November 30, 1954) Mr. Buckland traded the car to North Side in its damaged condition. It was in North Side's body shop from November 30 to December 20, 1954. No records were maintained by North Side with respect to the identity of the employees who did repair work on the vehicle. The man employed by North Side as its power-steering mechanic at the time was called and he testified that he did no work on this car between November 30 and December 24, 1954.

Emil O. Anderson, a North Side employee who was driving the Chrysler at the time of the critical events, obtained possession of it on December 24, 1954. He drove to the scene of the accident from 49th and Lyndale Avenue North in Minneapolis—a distance of about 120 miles—in about 2 hours.

The accident scene was 9 miles south of Aitkin, Minnesota, on Highway No. 169. For one driving north as Anderson was, the highway curves there at about a 90-degree angle to the east, and the grade is level. The weather was clear and dry. It was dark. The crushing impact between the northbound Chrysler and the southbound Pontiac occurred in the curve near a point on the highway where the Farm Island Lake Road intersects Highway No. 169.

Anderson testified that just before the collision he had driven the Chrysler onto the wrong side of the road in an effort to avoid striking an animal. Then he saw lights which he came to realize were those of an oncoming car. He met it head on in the southbound land of travel. Anderson testified that he was unable to steer the car back into its proper lane. Whether this inability was due to a mechanical defect for which Chrysler was responsible is the critical question in the case.

The Chrysler laid down skid marks. There was a dark rubber tire mark 92 feet long observed near the westerly edge of the highway leading up to the point of impact. At its most southerly point this tire mark was about 30 inches from the edge of the road; at about midpoint, 16 inches;

and at its most northerly end, about 24 inches. There was also an extremely light, almost invisible mark from another tire of the vehicle paralleling and easterly of the mark described. The first mark was entirely in the traveled surface of the highway and followed the curve, i. e., a 90-degree angle to the right for northbound vehicles.

On December 24, 1954, the Chrysler was towed to the Aitkin Motor Company garage in Aitkin from where it was taken to North Side Motors in the city of Minneapolis. The record does not disclose when or how the vehicle was transported from Aitkin to Minneapolis where it was inspected by the witnesses Myron Deering and Carl Biederman, Holt Motor Company mechanics. Biederman crawled under the car and saw the broken sector shaft, part of which stuck out of the housing and part of which was in the Pitman arm, but he removed nothing. Later, the power-steering unit was removed from the vehicle by witness John Persons. The witness Lee Doering carried the parts from North Side and delivered them to Deering at Holt Motors. After inspection of the parts by Deering and Biederman, Lee Doering delivered the sector shaft to Professor William MacKay at the University of Minnesota and later picked it up from MacKay. He then took all the parts in a box and put them in the attic of the Hardware Mutual Building in Minneapolis where (except while being tested by the experts) they were kept until trial.

We come now to a discussion of the sector shaft. It is a part of a power-steering unit of a type first manufactured by Gemmer in 1933 and in general use by 1951. The sector shaft is approximately 10 inches in length with a diameter reducing from $1\frac{1}{3}$ inches at its proximate end to $1\frac{1}{4}$ inches at its distal end. It transmits power, initiated manually by the driver and magnified by hydraulic pressure, through a worm-type gear to the Pitman arm, a device which, upon being moved backward or forward by the sector shaft, conveys steering control through a linkage system to rods tied to the front wheels. In use on the Chrysler the sector shaft (except for its distal end, serrated to fit firmly into the Pitman arm) is encased in a steel housing bolted to the top of the frame about two inches inside the left front fender.

The sector shaft (exhibits Q and R) and housing (exhibits S-1 et seq.) which were introduced and received in evidence in this case were offered

and accepted upon the theory that the assembly was a part of the steering mechanism of the Chrysler at the time of the accident.

The housing received in evidence bears identification number 379, keying it to an assembly sheet maintained by Gemmer in which the housing in question bears the label 3NCO3, a designation number used by Gemmer commencing July 23, 1951. The first Gemmer recorded shipment of power-steering units bearing the number 379 was made from Gemmer to Chrysler on October 17, 1951. This was about one month after the assembly date of the Chrysler here involved according to Chrysler records (i. e., September 24, 1951), but about one month before the date (November 26, 1951) when the Chrysler was obtained by Mr. Buckland from Standish-Bishop. If these records be accepted as accurate, the power-steering unit here involved was added to the Chrysler after assembly. But the record does not negative the possibility that it was installed by Chrysler before shipment.

The housing (plaintiff's exhibit S-1) is stamped with the numbers "6-2." This number was deciphered by Gemmer's chief engineer of advanced development, C. F. Hammond, as meaning that the assembly was completed by Gemmer during the sixth week of 1952. If this be true, the housing involved could not have reached Chrysler until three months after sale of the car at retail to Buckland. There is no evidence to show that the housing reached the vehicle through Chrysler at any time after Chrysler No. 7751409 was shipped to Chrysler's dealer in 1951.

Four valves were offered and received in evidence on the theory that the valves were a part of the assembly at the time of the accident (exhibits S-15, 16, 17, 18). Three are of one type and the fourth of another. One of the valves (S-17) was first produced by Gemmer, according to shop drawings produced at the trial, in November of 1951. However, the dates with respect to the valves may not be entirely reliable.

The evidence indicates that the sector shaft introduced in evidence (exhibits Q and R) was manufactured between July 2, 1951, and November 7, 1951, because of these characteristics of three grooves appearing on plaintiff's exhibits Q and R:

(a) The first and third grooves were machined at an angle of 30 de-

grees, a change (from a 45-degree angle) which became effective on July 2, 1951.

(b) After November 7, 1951, sector shafts manufactured by Gemmer were cut with three complete grooves instead of two grooves and a quarter radius as on plaintiff's exhibits Q and R. The witness Hammond, the inventor of the shaft, indicated the likelihood that this sector shaft was manufactured shortly after July 2, 1951, when he testified that a part of it was "turned" rather than "broached," the latter method of shaping the part having been substituted for the former.

To add a further complication, lock washers were not used routinely in the assembly of the hydraguide by Gemmer; the power-steering unit introduced by plaintiff contained two lock washers.

The recorded testimony of Emil O. Anderson, driver of the Chrysler at the time of the accident, is confusing and inconsistent. It is not possible to tell from reading the record whether this is due to his inability to understand the questions of the attorneys; to his limited capacity for verbal expression; to lapses of memory due to the passage of time; to the difficulties to be expected of a witness whose pre-impact observations were followed by injuries causing loss of consciousness; or to a combination of such factors. The net result is to leave one in doubt as to whether his impressions of what occurred *immediately* before the accident were sufficiently accurate to permit any fact determination based on what he had to say, either in court or elsewhere. Without the benefit of a firsthand observation of his testimony as given, the best we can do is to say that it is possible that the jury could have concluded the following from it:

(1) Anderson had no difficulty with the steering mechanism until he attempted to return to his own lane of travel just before the impact.

(2) The steering mechanism responded satisfactorily when he pulled into the wrong lane of travel in an effort to avoid an object which appeared suddenly in front of him.

(3) The steering mechanism failed to respond when he turned the steering wheel in an effort to regain his proper lane of travel.[1]

---

[1] "Q. Do you have a memory of turning your wheel to the right to stay on the highway?

(4) This failure occurred at a time *before* he recognized that certain lights that he had noted in the distance were part of an oncoming car.[2]

(5) He then recognized that the lights ahead of him were the lights of a car in the lane in which he was moving and from which he could not turn.

(6) The collision followed.

By cross-examination aided by reference to prior statements and depositions, testimony was elicited from Anderson which, considered together with his testimony upon direct examination, might conceivably support the following jury findings:

(1) Anderson had experienced no trouble whatever with the steering mechanism at any time up to *and including* the moment of impact.[3]

---

\* \* \* \* \*

"A. I remember trying to turn it, yes.

"Q. And did you have resistance on the steering wheel?

"A. There was nothing."

[2] "Q. \* \* \* Do you remember whether or not you had started to turn your car to the right from its course going across the highway to the west when you first realized a car was approaching, that it was a car?

"A. I would say I tried to turn before \* \* \* I realized it was a car, yes.
\* \* \* \* \*

"Q. \* \* \* You started, then, according to your recollection, to turn your car to the right before you realized that a car was approaching?

"A. That's right."

[3] One of the attorneys for the defendant, referring to an oral conversation with Anderson before the trial, questioned him with respect to what was then said in this way:

"Q. \* \* \* You never indicated to me at any time that I was in your trailer when we were talking about the steering on that car that there was ever anything wrong with it at any time up to the accident? That is a true statement, is it not?

"A. Could be.
\* \* \* \* \*

"Q. And I ask you if \* \* \* it is not a true statement that in your words you told me there was nothing wrong with the steering on that car?

"A. I suppose I did."

Again, referring to a pretrial deposition taken in the personal injury litiga-

(2) Anderson saw the lights of the oncoming car and recognized them as such as he moved into the wrong lane.[4]

(3) When Anderson saw the oncoming car it was so close that he could not have turned back into his own lane no matter what the condition of the steering mechanism might have been.[5]

(4) When Anderson turned the steering wheel in an effort to get back into his own right lane of travel, there was not a complete absence of response to the turning of the steering wheel, but instead a marked *resistance* to the attempted direction of the steering wheel.[6]

---

tion resulting from the accident, defendant's attorney developed that the following pretrial testimony was given by this witness:

"Question: After you got over there with this other car approaching you didn't have opportunity to get back over to avoid it? Answer: That's right." Defendant's attorney then asked:

"Q. * * * there was nothing said or claimed that there was anything wrong or improper or difficult about the steering of that car, isn't that true?

"A. That's right, just what is in there."

[4] It was established that in a pretrial deposition, Anderson testified: "Question: How long had you been on the wrong side of the road when you first saw the other car? Answer: I mostly just turned over there, right after I turned over there."

[5] A written statement given by Anderson before the trial included this:

"* * * At that point [when the Chrysler went into the left lane of travel] a car was coming right at us going south in this southbound lane. It was about 6:00 p. m. at the time, dark, and the other car's headlights were coming right at us. I remember turning the wheel to the right trying to get back over and out of the way, but it seemed like I couldn't, and then came in the impact right then with the oncoming car."

[6] Upon cross-examination these questions and answers were developed:

"Q. In other words, when this emergency arose where this car was in front of you and a collision was imminent, you tried to turn the wheel to the right, is that correct?

"A. Yes.

"Q. And it was tight and you were unable to turn completely to the right?

"A. Well, it wouldn't turn.

"Q. In other words, you tried to turn it to the right and you couldn't turn it to the right?

"A. It wouldn't turn, yes.

The cited instances of apparent conflict and confusion are not exhaustive but serve to illustrate the situation as it existed when the attorney for the plaintiff, in an apparent effort to rehabilitate the witness, offered in evidence an unsigned statement taken from Anderson on December 28, 1954. Objection was made to the receipt of this statement upon all relevant grounds. In considering whether the statement should be admitted, the court said:

"This witness seems so weak and inconclusive that I think any able cross examiner could get him to at least qualifiedly admit almost anything or agree that maybe or possibly it might be true, or something of that kind. And, of course, the part where he said that there was nothing wrong with the steering gear, well, now, he at least, towards the last, wants to put the interpretation on it that he meant while he was driving it around town and on the highway up there, that he didn't notice anything wrong with the steering."

The statement was received in evidence. It is not in the handwriting of Emil O. Anderson and is not signed by him. It was taken by an insurance adjuster. Anderson refused to sign it because his attorney had given him general instructions not to sign any statements. He testified that were it not for these instructions he would have done so. In a later statement taken on February 16, 1955, which he did sign, he acknowledged the existence at least of the December 28, 1954, statement in that the signed statement includes the following: "I wish to give the following informa-

---

"Q. You remember, then, that the wheel was very firm in your hands and that you were trying to turn it to the right and that you were unable to turn it to the right?

"A. Yes.

"Q. As far as you wanted to turn it to the right?

"A. Well, it wouldn't turn."

At another point in the record this testimony appears:

"Q. In other words, to describe what you felt at this time was that the steering wheel turned harder, is that right?

"A. Well, I tried to turn the wheel, yeah, and when I turned it, how much, I don't know.

"Q. But it turned hard?

"A. Real hard."

tion, which is in addition to the information given in my report dated December 28, 1954." And again: "I have read the above 6½ pages, and I find them to be true and correct to the best of my knowledge. This report is made as an addition to my report of Dec. 28, 1954, and is not to be construed as a correction of that report."

Anderson's testimony considered as a whole indicates that he had no recollection of the contents of the December 28, 1954, statement except that which he acquired by reading it shortly before the trial.

The statement was received on the theory that it was in part at least corroborative of the testimony which he had given which would support inferences favorable to the plaintiff and it included, in part, these assertions:

"I swerved over onto the left hand side of the road to avoid hitting this 'thing.' I then tried to turn back onto my own side of the road, but I could not get back to the right. I remember pulling on the steering wheel as hard as I could, to get back on my own side of the road, but I could not get back. I used all the force I could muster, to try to get back. I was pulling so hard that I was up off my seat, trying to get over.

\* \* \* \* \*

"As this was going on, I could see headlights flickering through the trees on my right. I do not know how far away it was when I saw it, but I think it was a car, though it could have been a house or something."

Defendant's position on appeal is that, accepting the instructions as given by the trial court as the law of the case, plaintiff has failed to sustain the burden of producing evidence adequate to support the necessary affirmative answers to these four questions:

(1) Was the sector shaft received in evidence, which allegedly failed, a part of the Chrysler being operated by Anderson at the time of the accident?

(2) Did the sector shaft fail because of defects attributable to the manufacturing process?

(3) Was the accident proximately caused by a failure of the sector shaft?

(4) Was the sector shaft which was received in evidence supplied by defendant Chrysler corporation?

Defendant also contends that prejudicial error resulted from the receipt in evidence of the unsigned statement taken from Anderson on December 28, 1954.

■ It is undisputed that a power-steering assembly used on a Chrysler of the type here involved is manufactured by Gemmer; includes a sector shaft; and is of the kind which was removed from the damaged vehicle. The sector shaft (exhibits Q and R) and the balance of the assembly (exhibits S-1 et seq.) were offered and received upon a factual foundation which, although incomplete, was adequate to support the essential findings that these exhibits were removed from the Chrysler here involved in February 1955; that the power assembly received was, for relevant purposes, in substantially the same condition as it was *immediately after the accident of December 24, 1954;* and that there had been no such alteration of these parts from the time of removal until the time of trial as would affect the critical questions in this case. There are notable gaps in the evidence produced by plaintiff in an effort to show the "chain of possession" with respect to these exhibits. Nevertheless, we feel justified in light of our opinion in Lestico v. Kuehner, 204 Minn. 125, 282 N. W. 122, in treating the parts received as adequately tied to the Chrysler as of the time of the collision.

■ The sector shaft with which the Chrysler was equipped broke in two. Plaintiff contended that this break was a "fatigue failure," which resulted from improper methods of manufacture culminating in a separation of the shaft just before the head-on collision. Defendant's witnesses testified that the fracture of the sector shaft was of a kind produced by sudden impact rather than by gradual deterioration. On this crucial question there was a clear conflict in the testimony produced by the expert witnesses for the contending parties. It is not for this court to evaluate the credibility of these opposite opinions. We cannot say that the opinion of plaintiff's experts was unworthy of belief as a matter of law.

The sector shaft fractured at a point where it is grooved in the manufacturing process. Professor Fulton Holtby of the University of Minnesota was qualified to express an opinion concerning the techniques used in

the manufacturing process which produced the sector shaft by reason of his training as a registered professional engineer; practical experience as a machinist and foundry engineer; teaching experience pertaining to machinery; and supervisory experience with respect to the process involved in machining, heat treating, grinding, and parts inspection. It was his opinion that the groove machined into the sector shaft at the site of the fracture disclosed poor workmanship evidenced by the roughness of the cut, a circumstance of significance because (a) the stresses to which a sector shaft is exposed in use concentrate at this point, and (b) rough machining at the point of stress concentration reduces the capacity of the part to withstand the deteriorating forces which bring about fatigue failure.

Robert Picha, a registered professional metallurgical engineer who graduated from the University of Minnesota in 1949, made a detailed study of the sector shaft. He found that in the area of the groove where the failure occurred the steel was less hard and, therefore, less fatigue-resistant than it should have been. He expressed his opinion that the sector shaft failed due to progressive deterioration caused by these manufacturing defects and not because of forces generated by the collision.

The fact that the sector shaft appears to be unscarred at the point of connection between it and the Pitman arm lends credence to the theory that the fracture resulted from fatigue failure rather than violent impact.

■   The jury could have found from the evidence that the sector shaft became inoperative just before the fatal collision. Such failure would be a logical explanation for the fact that Anderson, having turned sharply to his left to avoid striking an object in or near his lane of travel, found himself unable to steer the car back into its proper lane when he attempted to do so. We recognize that his recitation of the significant events at this point—at least as his testimony appears in the record to which we are confined—raises serious questions as to the validity of any inferences drawn from it. But, whatever doubts we may entertain, we feel bound to accept the finding implicit in the jury's verdict that the steering mechanism became inoperative when Anderson attempted to turn back into his own side of the road; and that, with the oncoming vehicle then such a distance from him that he was unable to recognize it as such, he would have

been able to steer it back into its proper lane of travel if the sector-shaft failure had not prevented him from doing so. To so much of the evidence as is persuasive of the inference that failure of the steering mechanism had nothing to do with this head-on collision (the marks laid down by the Chrysler, for example), an answer sufficient to satisfy the jury may have been found in statements attributed to Anderson and made by him immediately after the accident that the "car didn't steer right."

■ In our judgment the evidence does not support a finding that the sector shaft was a part of the Chrysler at the time it was delivered to Standish-Bishop, the Minneapolis Chrysler dealer from whom it was purchased by Charles C. Buckland, who in turn sold it to North Side.

*Were it not for the factory records received in evidence,* the jury might reasonably have found:

(1) That the sector shaft and the power-steering assembly of which it was a part were manufactured by Gemmer.

(2) That the Chrysler automobile delivered by defendant to Standish-Bishop was equipped with a power-steering unit by Gemmer which included a sector shaft.

(3) That under ordinary circumstances an agency selling a new automobile such as Standish-Bishop would have no reason to make changes or alterations in the power-steering mechanism with which a newly manufactured automobile was equipped. If it did, information to that effect would be readily available to the defendant and would have been produced by it at the trial if it existed. The evidence was not produced. Therefore, *Standish-Bishop made no such change or alteration.*

(4) That although Charles C. Buckland, the first owner of the car, had it for 3 years and drove it for 38,000 miles, any radical change in the power-steering assembly occurring during that period would ordinarily have come to his attention. None did. *Therefore, there were no changes of the power-steering mechanism while Buckland owned the car.*

(5) *That the accident of November 29, 1954, did not cause damage to the sector shaft requiring a change or replacement* in view of the fact that Buckland drove it from the scene without trouble and the testimony of North Side's only power-steering mechanic at the time that he had done no work on it.

But the underlined inferences of fact set out in the previous paragraphs, being based on negative evidence,[7] are valid only if the sector shaft *and* the housing encasing it were made a part of the automobile by Chrysler. True, the claim of defect is limited to the sector shaft. And the evidence shows that it was manufactured by Gemmer at a time when conceivably it could have been made a part of a Gemmer-manufactured assembly delivered to Chrysler before it transferred possession of the vehicle to Standish-Bishop. But this sector shaft which failed on December 24, 1954, cannot be tied to Chrysler on the present record unless the housing which enclosed the power-steering unit when the vehicle left Chrysler's hands was in use on the vehicle when the accident happened. That is why the testimony of Buckland and others was offered and received to show that nothing had been done to change the unit during the interval. But if the housing which encased the sector shaft at the time of the accident was not in existence when the car left Chrysler's hands, can we say that the assembly was not altered in the interval? And if the alteration involved resulted in the replacement of the housing, what basis do we have, save conjecture, for deciding that the sector shaft was not also replaced? And if replaced, how can we hold Chrysler liable when the source of replacement parts for Gemmer-manufactured steering assemblies might or might not have been Chrysler? We have examined the record and briefs with care and find no answer to these questions.

If there was evidence that the vehicle remained in Chrysler's hands until after October 17, 1951 (and this is doubtful since we do not have the date of shipment), the stamped number 379 appearing on the housing could be reconciled to assembly by Chrysler before shipment to Standish-Bishop. So far as the record now discloses, the car was fully assembled by Chrysler on September 24, 1951. It may have been shipped sometime between September 24 and November 26, but for some reason the record does not give us this extremely important date.

If the vehicle remained in Chrysler's hands until sometime in Novem-

---

[7] See, Purdes v. Merrill, 268 Minn. 129, 128 N. W. (2d) 164; Forde v. N. P. Ry. Co. 241 Minn. 246, 63 N. W. (2d) 11; Jorgenson v. Minneapolis, St. P. & S. S. M. Ry. Co. 231 Minn. 121, 42 N. W. (2d) 540; Jensen v. Christensen, 216 Minn. 92, 11 N. W. (2d) 798.

ber, we would perhaps be justified in assuming that the valve (exhibit S-17), first manufactured by Gemmer in 1951, was made a part of the assembly before shipment by Chrysler although we would still be puzzled as to why Gemmer would assemble a power-steering unit with three valves of one kind and a fourth of another. *But we cannot say that an assembly completed in February of 1952 could have been made a part of a vehicle delivered not later than November 26, 1951.* And that is what we must do unless we are to disregard the testimony that the stamped numbers "6-2" denote the sixth week of 1952.

It can be argued, of course, that the jury was free to accept or reject the testimony of the witnesses who attempted to fix the dates on which the relevant exhibits were manufactured by reference, in part, to the design specifications in use at one time or another, and in part, to the numbers appearing on the housing. If, for example, evidence were available to show the existence of a housing manufactured by Gemmer and bearing identification number 379 which left Gemmer's hands at a time before that specified in the testimony, or a stamped number comparable to the "6-2" on a Gemmer-manufactured product which could not have been manufactured at the time said to be represented by this number, the factory records could be rejected as unreliable and the inferences to be drawn from the negative testimony could be accepted as reasonable. But without something to show the inherent improbability of the manufacturing dates fixed by these numbers as interpreted by these witnesses, plaintiff has failed to sustain its burden of proving that the sector shaft with which this vehicle was equipped on December 24, 1954, was the same one and in the same condition, except for changes attributable to improper manufacture, as that supplied by Chrysler sometime between September 24 and November 26, 1951.

■ The trial of this case began on September 9, 1963, and continued until October 15, 1963, when the verdict of the jury was returned. Much of the testimony taken related to the issues which were decided implicitly in plaintiff's favor. We have concluded that it would not be practical or desirable to litigate again the questions which have been resolved by the jury's verdict and which we have found adequately supported by the

evidence.[8] We remand to the district court, therefore, for retrial by a jury of this issue only: Was the sector shaft (exhibits Q and R) supplied by defendant, Chrysler Corporation?

■ Although the foundation of the receipt in evidence of plaintiff's exhibit MM was tenuous, we believe the receipt of it in rehabilitation of the testimony of the witness Anderson was not prejudicially erroneous. State v. La Bar, 131 Minn. 432, 155 N. W. 211; Sullivan v. Minneapolis St. Ry. Co. 161 Minn. 45, 200 N. W. 922; In re Estate of Ylijarvi, 186 Minn. 288, 243 N. W. 103. We note that the trial court cautioned the jury that a prior consistent statement was to be considered only on the question of credibility and not for any other purpose.

Affirmed in part; reversed in part; remanded to the district court for retrial of limited issue as specified in this opinion.[9]

Taxation of disbursements will be limited to expenses incurred in presenting the issue with respect to which appellant has prevailed.

---

[8] See, Ulrich v. Minneapolis Boxing and Wrestling Club, Inc. 268 Minn. 328, 129 N. W. (2d) 288.

[9] The questions raised on this appeal being essentially questions of fact, no attempt has been made to discuss the legal principles involved in the trial of products liability cases generally. Recent decisions of this court relevant to the problem include: Lovejoy v. Minneapolis-Moline Power Imp. Co. 248 Minn. 319, 79 N. W. (2d) 688; Hofstedt v. International Harvester Co. 256 Minn. 453, 98 N. W. (2d) 808; Grant v. Malkerson Sales, Inc. 259 Minn. 419, 108 N. W. (2d) 347; Rosin v. International Harvester Co. 262 Minn. 445, 115 N. W. (2d) 50.

Cases from other jurisdictions which have been examined and which involve appellate review of the evidence, include: Denna v. Chrysler Corp. 1 Ohio App. (2d) 582, 206 N. E. (2d) 221; Necaise v. Chrysler Corp. (5 Cir.) 335 F. (2d) 562; Ford Motor Co. v. Puskar (Tex. Civ. App.) 394 S. W. (2d) 1; Ford Motor Co. v. McDavid (4 Cir.) 259 F. (2d) 261; Gwyn v. Lucky City Motors, Inc. 252 N. C. 123, 113 S. E. (2d) 302; Markel v. Spencer, 5 App. Div. (2d) 400, 171 N. Y. S. (2d) 770; O'Donnell v. Geneva Metal Wheel Co. (6 Cir.) 183 F. (2d) 733; Kanatser v. Chrysler Corp. (10 Cir.) 199 F. (2d) 610; Pierce v. Ford Motor Co. (4 Cir.) 190 F. (2d) 910; Guagliardo v. Ford Motor Co. 7 App. Div. (2d) 472, 184 N. Y. S. (2d) 1012; Courtois v. General Motors Corp. 37 N. J. 525, 182 A. (2d) 545. See, also, Chrysler Corp. v. Rogers, 92 Ga. App. 109, 88 S. E. (2d) 318.