STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, a corporation, and LESTER J. BAHL, appellants, v. ANDERSON-WEBER, INC., and FORD MOTOR COMPANY, corporations, appellees.

No. 50340.

(Reported in 110 N.W.2d 449)

August 15, 1961.

Clewell, Cooney & Fuerste, of Dubuque, for appellants.

Kenline, Roedell, Hoffmann & Reynolds, of Dubuque, for Anderson-Weber, Inc., and O'Connor, Thomas, McDermott & Wright, of Dubuque, for Ford Motor Company, appellees.

SNELL, J.—This is an action at law by auto purchaser and subrogated insurance carrier against dealer and manufacturer for breach of warranty. Plaintiff Bahl purchased from defendant Anderson-Weber, Inc., the Dubuque Mercury dealer, a new Mercury automobile manufactured by defendant Ford Motor Company, and insured it against loss by fire with plaintiff State Farm Mutual Automobile Insurance Company. Ten days and about 300 miles later, while driven by plaintiff Bahl, the car burst into flames and except for small salvage value was destroyed.

The insurance company paid its insured under the fire insurance policy and to the extent thereof is subrogated to the claim of Bahl.

The car was delivered to Mr. Bahl on December 29, 1956. There was no detailed discussion as to the form or content of either implied or express warranty. Neither party has any definite recollection of the delivery of an authorized Mercury dealer's service policy, a form prepared by the manufacturer on the back of which is printed a "dealer warranty", but it is admitted that if this was not delivered, it should have been as a matter of custom. Both parties assumed that there was the usual new car warranty. The dealer warranty referred to warrants the product to be free under normal use and service from defects in material and workmanship for a period of 90 days or until such product has been driven for a distance of 4000 miles, whichever event shall first occur. The dealer's obligation is limited to replacement of, without charge to purchaser, such parts as shall be returned to dealer, with transportation charges prepaid and as shall be acknowledged by dealer to be defective. It also states that it is expressly in lieu of all other warranties, express or implied. This so-called dealer warranty is not prepared by the dealer but is forwarded with the car by the manufacturer to the dealer. It fits into the business pattern by

which the manufacturer directs the purchasing public to its authorized dealers rather than to the manufacturer.

The purchase of the car was accompanied by a signed order of the purchaser on a form prepared by the local dealer describing the car and the conditions incident to the purchase. On the back there is a so-called manufacturer's warranty.

The manufacturer denies that there was any authority in the dealer to make any warranty binding upon the manufacturer. Although there is now attempted reliance on the restrictions therein, the dealer has no recollection of ever having read or considered this so-called warranty in its entirety.

Paragraph 7, as it appears on the back of the order, provides as follows:

"It is expressly agreed that there are no warranties, express or implied, made by either the dealer or the manufacturer on the motor vehicle, chassis or parts furnished hereunder except as follows:

" 'The manufacturer warrants each new motor vehicle (including original equipment placed thereon by the manufacturer except tires), chassis or part manufactured by it to be free from defects in material or workmanship under normal use and service. Its obligation under this warranty being limited to making good at its factory any part or parts thereof which shall, within ninety (90) days after delivery of such vehicle to the original purchaser or before such vehicle has been driven 4,000 miles, whichever event shall first occur, be returned to it with transportation charges prepaid and which its examination shall disclose to its satisfaction to have been thus defective; this warranty being expressly in lieu of all other warranties expressed or implied, and all other obligations or liabilities on its part, and it neither assumes nor authorizes any other person to assume for it any other liability in connection with the sale of its vehicles. This warranty shall not apply to any vehicle which shall have been repaired or altered outside of an authorized service station in any way so as in the judgment of the manufacturer to affect its stability and reliability, nor which has been subject to misuse, negligence or accident.'

"The dealer agrees to install any part or parts furnished

under the manufacturer's warranty above on the motor vehicle covered in this order without charge to the owner of such motor vehicle.

"This warranty does not apply to second-hand cars or cars not mentioned in the above order.

"The dealer also agrees to promptly perform and fulfill all terms and conditions of the owner service policy."

After delivery of the car, plaintiff Bahl noticed some minor difficulty with the windshield wipers and the electric clock. These difficulties were remedied by the dealer.

The fan on the car heater operated, but very little heat was delivered. An odor described as a funny smell like rubber burning was noted, but the source was not discovered. At least part of the gas for the car was obtained by Mr. Bahl from his personal farm tank located on a four-legged stand near his barn. The tank had an exposed nozzle.

On January 8, 1957, while driving at a speed of 30 to 35 miles per hour, going up a slight incline, and with about 305 to 306 miles on the car, there was a flash of flame against the windshield. Mr. Bahl pulled the car off onto a side road to the right of the highway and jumped therefrom. The car rolled ahead 100 to 150 feet and stopped in a shallow ditch. Flames as high as 10 feet were coming up around the hood.

A local fire department was alerted and upon arrival extinguished the fire but not until, for all practical purposes, the car was destroyed.

At the trial, testimony, both lay and expert, was introduced as to the condition of the car and such parts thereof as could be identified and examined. Parts of the wiring system showing a fusing or balling of the wires were introduced as exhibits.

There was testimony by witnesses, claiming to be experienced in investigating fire losses, that the cause of the fire was a short circuit within the electrical circuit of the car. The competency of these witnesses, the admissibility of the testimony and the probative value thereof were, in each instance, vigorously assailed by defendants.

I. It is not for us to pass upon the probative value,

1294

nor to say what the jury should believe, but there was evidence to be considered by a jury.

In addition to denying that there was any evidence of mechanical defect in the car, defendants' witnesses expressed the opinion that dirt or chaff injected into the car's gas tank through the exposed nozzle of the farm gas tank caused gas to overflow from the car's carburetor onto hot portions of the engine causing the sudden fire.

At the close of plaintiffs' evidence and again at the close of all of the evidence each defendant moved for a directed verdict. The grounds set forth in these motions are numerous, with subdivisions and assumptions arguendo, and cover ten pages in the record.

Each ground urged has been considered, but for the purpose of this opinion the controversial issues may be summarized as follows: That the case was not tried on any theory of implied warranty; that such express warranties as were given, if any, negative any implied warranty; that there are no provisions in the express warranty under which plaintiff has any right to recover; that there was no proof of causation, nor of measure of damage; that there was no return of defective parts as required by the warranty; that there was no proof of privity of contract between the plaintiff and the Ford Motor Company, no authority from the dealer to issue any warranty binding on the manufacturer, and no subrogated right in the insurance carrier to recover.

The trial court sustained both motions on all grounds.

The issue before us is the sufficiency of the evidence for submission to the jury. It is for us to determine what a jury could find and not what a jury should find.

The cause of the fire was a question of fact. If the fire was caused as claimed by plaintiffs, were the defendants, or either of them, liable for breach of warranty?

■ II. This case is bottomed squarely upon the law of warranty and is not based upon liability for negligence. The doctrine of res ipsa loquitur, frequently resorted to in negligence cases, is not applicable as such in the field of warranty, although the usual resort to circumstantial evidence in attempt-

ing to establish a breach of warranty indicates some of the same thinking found in res ipsa loquitur cases.

III. Liability of a manufacturer for breach of an implied warranty is not new in Iowa. While such liability is frequently applied in connection with food or drink products, it is not limited thereto. As subsequently noted, it has recently been applied in other jurisdictions in a much wider field such as automobiles.

 The general and early rules as to implied warranty are of long standing. In Alpha Checkrower Co. v. Bradley & Co., 105 Iowa 537, 546, 547, 75 N.W. 369, 372, a case involving corn cutters, the court quoted with approval: "* * * where a chattel is to be made or supplied to the order of the purchaser, there is an implied warranty that it is reasonably fit for the purpose for which it is ordinarily used * * *." The rule of exclusion by express warranty "does not extend to the exclusion of warranties implied by law, where they are not excluded by the terms of the contract."

In many instances such as sales at public auction or where the purchaser has made his own inspection, there may be a sale without warranty, but the cases cited by defendant Ford Motor Company are not persuasive in the instant case where the manufacturer is denying privity and the authority of the local dealer to make any manufacturer's warranty. If there was a defect in the car, the defendants' position is evasive rather than persuasive.

In Davis v. Van Camp Packing Co. (1920), 189 Iowa 775, 800, 176 N.W. 382, 390, 17 A. L. R. 649, the plaintiff became ill of food poisoning after eating pork and beans canned by defendant and sold through retailers. The evidence was reviewed and found to present a jury question. The authorities were extensively analyzed and developments noted. It was held that there is an implied warranty by the manufacturer "and that the question as to privity is not controlling." Reference to and complete approval of the Davis case appears in Anderson v. Tyler, 223 Iowa 1033, 274 N.W. 48 (mouse in bottle case).

IV. Two recent cases have carefully analyzed problems

1296

comparable to the case at bar, and in referring to what is said therein, it should be kept in mind that the Iowa Sales Law follows the Uniform Sales Act, which has also been adopted in New Jersey and in Tennessee, from which jurisdictions we will quote. Under the provisions of chapter 554, there is an implied warranty that goods should be reasonably fit for the purpose for which sold and shall be of merchantable quality and have a quality or fitness for a particular purpose annexed by the usage of trade, and it is also provided that an express warranty or condition does not negative a warranty or condition implied under this chapter unless inconsistent therewith. See also Loxtercamp v. Lininger Implement Co., 147 Iowa 29, 125 N.W. 830, 33 L. R. A., N. S., 501.

The Supreme Court of New Jersey and the Court of Appeals of Tennessee at about the same time, early in 1960, considered the right of a purchaser of a new automobile to recover for defects therein and without reference to each other arrived at the same conclusion. See Henningsen v. Bloomfield Motors, Inc., 32 N. J. 358, 161 A.2d 69, 75 A. L. R.2d 1, and General Motors Corp. v. Dodson, Tenn. App., 338 S.W.2d 655.

The facts and issues in the New Jersey case are so comparable to the case at bar, the analysis of the problems so thorough and the reasoning so sound that we quote therefrom at length.

In the New Jersey case the plaintiff purchased from a local dealer a Plymouth automobile manufactured by Chrysler Corporation. The purchase order, as in the case at bar, was a printed form with a description of the car purchased and the terms of the purchase set forth, and in small type two paragraphs in almost the exact form as in the case at bar, quoted above, and subsequently discussed.

The new Plymouth was turned over to the purchaser on May 9, 1955. Thereafter it was used for short trips on paved streets. Ten days and 468 miles later the purchaser's wife was driving on a paved highway at 20 to 22 miles per hour. Suddenly she heard a loud noise "from the bottom by the hood." It "felt as if something cracked." The steering wheel spun in her hands; the car veered sharply to the right, crashed into

a highway sign and a brick wall and was destroyed. As a result of the impact the front of the car was so badly damaged that it was impossible to determine if any of the parts of the steering mechanism or workmanship was defective or improper prior to the accident. The car was declared a total loss by the insurance carrier.

The insurance carrier's inspector and appraiser of damaged cars, with 11 years of experience, advanced the opinion, based on the history and his examination, that something definitely went "wrong from the steering wheel down to the front wheels" and that the untoward happening must have been due to mechanical defect or failure. The case was submitted to a jury on the warranty theory.

The conditions under which the car was sold, the time and distance driven, the sudden destruction of the car and the inability to determine with exactness the cause thereof are conditions exactly comparable to the case at bar. About the only variance is that in the New Jersey case the failure was in the steering mechanism and in our case the car burst into flames. The conclusion as to the cause of a fire is not as inevitable as the conclusion where there is a complete failure of the steering mechanism, but we have said, supra, that the cause of the fire was a question of fact.

In discussing the claim of implied warranty against the manufacturer, the court said: "In the ordinary case of sale of goods by description an implied warranty of merchantability is an integral part of the transaction. * * * Perhaps no more apt illustration of the notion can be thought of than the instance of the ordinary purchaser who informs the automobile dealer that he desires a car for the purpose of business and pleasure driving on the public highway."

The court then quoted from the Supreme Court of Pennsylvania, Frantz Equipment Co. v. Leo Butler Co., 370 Pa. 459, 88 A.2d 702, as follows: " 'It is perfectly clear, then, that even if the sale be under a trade name there is implied an obligation on the part of the seller that the article delivered will be of the same quality, material, workmanship, and availability for use as articles generally sold under such name. It

would be wholly unreasonable to hold that, if one were to purchase, for example, an automobile under the trade name of 'Ford' or 'Buick' or 'Cadillac' or the like, no implied warranty of merchantable quality could be asserted by the purchaser even though the particular car delivered was in such bad condition, so gravely defective in materials and construction, that it could not be operated at all and was wholly useless for the ordinary purpose which an automobile is designed to serve.' "

The New Jersey court then continued: "The uniform act codified, extended and liberalized the common law of sales. The motivation in part was to ameliorate the harsh doctrine of *caveat emptor*, and in some measure to impose a reciprocal obligation on the seller to beware. The transcendent value of the legislation, particularly with respect to implied warranties, rests in the fact that obligations on the part of the seller were imposed by operation of law, and did not depend for their existence upon express agreement of the parties. * * * The particular importance of this advance resides in the fact that under such circumstances strict liability is imposed upon the maker or seller of the product. Recovery of damages does not depend upon proof of negligence or knowledge of the defect. * * *

"As the Sales Act and its liberal interpretation by the courts threw this protective cloak about the buyer, the decisions in various jurisdictions revealed beyond doubt that many manufacturers took steps to avoid these ever increasing warranty obligations. Realizing that the act governed the relationship of buyer and seller, they undertook to withdraw from actual and direct contractual contact with the buyer. They ceased selling products to the consuming public through their own employees and making contracts of sale in their own names. Instead, a system of independent dealers was established; their products were sold to dealers who in turn dealt with the buying public, ostensibly solely in their own personal capacity as sellers."

V. In discussing the manufacturer's warranty, the court then said: "The manufacturer agrees to replace defective parts for 90 days after the sale or until the car has been driven

4;000 miles, whichever is first to occur, *if the part is sent to the factory, transportation charges prepaid, and if examination discloses to its satisfaction that the part is defective.* It is difficult to imagine a greater burden on the consumer, or less satisfactory remedy. Aside from imposing on the buyer the trouble of removing and shipping the part, the maker has sought to retain the uncontrolled discretion to decide the issue of defectiveness. * * * Also suppose, as in this case, a defective part or parts caused an accident and that the car was so damaged as to render it impossible to discover the precise part or parts responsible, although the circumstances clearly pointed to such fact as the cause of the mishap. Can it be said that the impossibility of performance deprived the buyer of the benefit of the warranty?" The court definitely held not.

VI. "Preliminarily, it may be said that the express warranty against defective parts and workmanship is not inconsistent with an implied warranty of merchantability. Such warranty cannot be excluded for that reason [citations]."

VII. In discussing the question of privity between the buyer and the manufacturer, the court said: "There is no doubt that under early common-law concepts of contractual liability only those persons who were parties to the bargain could sue for a breach of it. In more recent times a noticeable disposition has appeared in a number of jurisdictions to break through the narrow barrier of privity when dealing with sales of goods in order to give realistic recognition to a universally accepted fact. * * * Makers and manufacturers know this and advertise and market their products on that assumption; witness, the 'family' car * * *.

"* * *

"Although only a minority of jurisdictions have thus far departed from the requirement of privity, the movement in that direction is most certainly gathering momentum. Liability to the ultimate consumer in the absence of direct contractual connection has been predicated upon a variety of theories. * * *

"Most of the cases where lack of privity has not been permitted to interfere with recovery have involved food and drugs. [citations] * * *. But more recently courts, sensing the inequity

of such limitation, have moved into broader fields * * * [citations].

"We see no rational doctrinal basis for differentiating between a fly in a bottle of beverage and a defective automobile."

VIII. The court held that under modern marketing conditions when a manufacturer puts a new automobile in the stream of trade and promotes its purchase by the public, an implied warranty that it is reasonably suitable for use as such accompanies it into the hands of the ultimate purchaser. Absence of agency between the manufacturer and the dealer who makes the ultimate sale is immaterial.

IX. The court discussed the effect of disclaimer and limitation of liability clauses on the implied warranty of merchantability. After discussing and analyzing the authorities from many jurisdictions to the effect that under conditions such as exist in the manufacturing and selling of automobiles the implied warranty cannot be so restricted, the court held that the terms and limitations set forth in the so-called express warranty do not relieve the manufacturer or the dealer from the obligations of an implied warranty.

. . "Public policy at a given time finds expression in the Constitution, the statutory law and in judicial decisions. In the area of sale of goods, the legislative will has imposed an implied warranty of merchantability as a general incident of sale of an automobile by description. The warranty does not depend upon the affirmative intention of the parties. It is a child of the law; it annexes itself to the contract because of the very nature of the transaction. * * * The disclaimer of the implied warranty and exclusion of all obligations except those specifically assumed by the express warranty signify a studied effort to frustrate that protection." (Page 404 of 32 N. J., page 95 of 161 A.2d)

The court, in discussing the evidence, indicated that part thereof was not entitled to very much probative force but that it was a question for the jury.

In the Tennessee case of General Motors v. Dodson, supra, the brakes locked, the car plunged into a ditch and property

damage and personal injury resulted. A jury verdict for plaintiff (purchaser) against the manufacturer was sustained.

The manufacturer's warranty was to the dealer. The terms, conditions and exclusions were comparable to those before the New Jersey court and now before us.

The court said at page 661 of 338 S.W.2d: "* * * our conclusion is this: there was an express warranty and an implied warranty from General Motors to plaintiffs. There is nothing inconsistent in the two warranties, so they may both be in effect at the same time."

In a supplemental opinion (page 665) on the question of privity, the court said: "Petitioner, through radio, television, and advertisements in magazines and newspapers, extols the virtues of its products. Surely it would not be contended that such advertisements and praise of General Motors' products were made for the benefit of its authorized dealers. These advertisements are made for the ultimate purchasers of General Motors' products who will use and drive them. They form a part of the warranty which General Motors gives the ultimate consumers."

It is our opinion that these recent pronouncements in New Jersey and Tennessee represent the most advanced thinking and the soundest conclusions in the field of new car warranties, express and implied.

In fairness to the trial court, it should be noted that the New Jersey and Tennessee opinions were subsequent to the trial of this case.

X. In Iowa the old rule of nonliability for negligence of a manufacturer of goods except to one in privity of contract has been repudiated. See discussion in Thompson v. Burke Engineering Sales Co., 252 Iowa 146, 153, 106 N.W.2d 351, 356, and citations.

The same reasoning applies in warranty as in negligence cases.

XI. Brakes should not be defective from the beginning. Steering mechanism should not fail, nor cars burn up within 10 days. When such things happen and there is evidence as to

1302

the cause, courts should be reluctant to deny the purchaser the right to submit his claim to a jury.

By this we do not mean that the mere happening of the event without evidence as to the cause creates a jury question. The burden of showing cause is on the plaintiff, but if he offers evidence from which reasonable minds could reach a conclusion, the question is for the jury. In the instant case the parties offered conflicting theories, supported by circumstantial evidence and opinion testimony. In order to establish a proposition by circumstantial evidence, the evidence must be such as to make the claimant's theory reasonably probable, not merely possible, and more probable than any other theory based on the evidence; but the evidence need not exclude every other possible theory. See Iowa State Bar Association Uniform Jury Instruction No. 1.7 and citations.

It is not for the court to say which theory is more probable. Plaintiffs' failure to return to the factory, transportation charges prepaid, defective parts, when as here the car is destroyed, does not impress us as a sound or good faith defense.

We have examined the issues, the evidence and the authorities and conclude that the case should have been submitted to the jury on the issue of causation with appropriate instructions on warranties, express and implied, measure of damage and the right of both plaintiffs to recover to the extent of their interest in the claim. The case is reversed and remanded for retrial.—Reversed and remanded.

All JUSTICES concur.