HAWKEYE–SECURITY INSURANCE COMPANY, Appellant,

v.

FORD MOTOR COMPANY, Cross-Petitioner-Appellee,

v.

KELSEY–HAYES COMPANY, Cross-Petition-Appellee.

No. 53572.

Supreme Court of Iowa.

Feb. 10, 1970.

———◆———

Patterson, Lorentzen, Duffield, Timmons & Irish, Des Moines, for appellant.

Jones, Cambridge, Carl & Feilmeyer, Atlantic, for cross-petitioner-appellee.

Ahlers, Cooney, Dorweiler, Allbee & Haynie, Des Moines, for cross-petition-appellee.

BECKER, Justice.

In this case plaintiff seeks indemnity or contribution for a loss incurred by reason of a truck-farm-tractor accident. Plaintiff, Hawkeye-Security Insurance Company, was the liability insurer of the truck involved in the accident. The injured farm-tractor operator, Mr. Koppold, sued the Tri-B Corporation and Tom Kolby, the owner and driver of the truck. Plaintiff-insurer conducted the defense, eventually settled the case for $17,500 and then brought action against Ford Motor Company as manufacturer of the offending truck. Ford Motor Company cross-petitioned and interpleaded Kelsey-Hayes Company as the company from which Ford claims to have purchased a brake drum alleged to have been defectively furnished.[1]

Plaintiff alleges and defendant admits that on August 15, 1962, Tri-B Corporation purchased a new truck from Ford Motor Company through its Iowa based dealer. Defendant Ford Motor Company also admits the accident happened, subsequent legal action by Koppold, a jury verdict against Tri-B Corporation in the amount of $20,902.30, eventual settlement by payment of $17,500, plus costs of $249.13 and that plaintiff thereby obtained an assignment by Thomas Y. Kolby and Tri-B Corporation for all their interest in such judgment, if any.

As the case reaches us, plaintiff has four theories in separate divisions in its petition. Three divisions seek indemnity on grounds of implied warranty of witness, strict liability in tort and active negligence by Ford as against passive negligence by Tri-B Corporation and its employee-driver. The fourth division seeks contribution on the theory the negligence of defendant Ford concurred with the negligence of Tri-B Corporation to cause the resulting damages for which Tri-B was eventually held liable.

The theories of strict liability in tort and active versus passive negligence were rejected by the court on motion to dismiss and will be considered infra. As to the other two theories a motion to direct a verdict at the close of plaintiff's case was sustained. The oral motion to direct was bottomed on the following grounds:

1. Division I, implied warranty of fitness, does not state a cause of action against defendant because plaintiff-insurer is not within the class of persons to which implied warranty is applicable, there being no showing of privity of contract between the parties.

2. There is no substantial evidence of breach of implied warranty of fitness, or of proximate cause.

3. Division II, contribution based on concurrent negligence, must fail because there is no substantial evidence of negligence on the part of defendant.

Plaintiff's assignments of error cover all four dismissed divisions; i. e., dismissal of the implied warranty of fitness-indemnity theory and the concurrent negligence-contribution theory, both of which were dismissed at the close of plaintiff's evidence; and dismissal of the strict liability in tort-

---

1. For the purposes of this opinion the position of Ford and Kelsey-Hayes are identical. The cross-petition between those two defendants is not involved. The opinion therefore considers only the case against Ford Motor Company.

indemnity theory and dismissal of the active versus passive negligence theory, both of which were dismissed at the pleading stage as contra to present Iowa law.

I. We first determine whether the principles applicable to implied warranty of fitness extend to this plaintiff and can be applied to the present controversy. Defendant vigorously contends plaintiff insurance company is a member of the general public; as such, it is not protected by the implied warranty and strict liability principles, citing Hahn v. Ford Motor Company, 256 Iowa 27, 126 N.W.2d 350.

■ Plaintiff claims defendant owes it an independent duty as implied warrantor. We need not extend the doctrine of implied warranty so far as to hold the vendor-warrantor owes a direct duty to the insurer of its vendee. Such a direct duty would make the subrogee independent of the obligations, duties and defenses of its subrogor. Thus the subrogee's rights might well, under certain circumstances, rise higher than those of its subrogor. We do not go so far.

■ But this does not mean plaintiff is a mere member of the general public who cannot plead and prove breach of implied warranty under the doctrine of Hahn v. Ford Motor Company, supra. There we dealt with the rights of a member of the public who was injured when a truck owned by Ford's vendee struck plaintiff's car. Here we deal with the rights of the vendee itself which are passed on to the subrogee. The vendee-subrogor was within the class protected by the principles of implied warranty. Its subrogee was also in the same class.

We do not think Blackford v. Sioux City Dressed Pork, 254 Iowa 845, 118 N.W.2d 559 or Iowa Power and Light Co. v. Abild Construction Co., 259 Iowa 314, 144 N.W.2d 303, dictate a different result. In both cases we recognized the possibility of an independent duty growing out of claimed contractual rights between the parties.

Here there is an independent duty but it runs to Tri-B Corporation. Plaintiff has the benefit of such duty as subrogee, not because of an implied promise running directly to it.

Plaintiff, both in its recast petition and in its argument here, shows the existence of its status as subrogee and assignee of the rights of its insured Tri-B Corporation. Defendant's answer admits that by payment of $17,500 and obtaining satisfaction of the judgment "plaintiff thereby obtained an assignment by Thomas Y. Kolby and Tri-B Corporation of all their interests in said judgment, if any." In its opening statement of facts in this court, plaintiff states: "Appellant is an insurance company who insured Tri-B Corporation and Tom Kolby. This action is like a subrogation claim with Appellant standing in the same shoes of Tri-B Corporation and Tom Kolby. For ease of communication we will consider the Appellant as being Tri-B Corporation and Tom Kolby."

In Hawkeye-Security Company v. Lowe Construction Co., 251 Iowa 27, 99 N.W.2d 421, 428, we said: "Defendant has cited a few older precedents from states *where contribution is not allowed between joint tort-feasors* which hold, in effect, that an indemnitor, subrogee or assignee of one of the tort-feasors acquires no greater right to contribution than the tort-feasor had. See, as to rights of an assignee, Manowitz v. Kanov, 107 N.J.Law 523, 154 A. 326, 75 A.L.R. 1464, and Annotation 1468, and, as to rights of an indemnitor of one of the tort-feasors, Royal Indemnity Co. v. Becker, 122 Ohio St. 582, 173 N.E. 194, 75 A.L.R. 1481 and Annotation 1486 (supplemented in 171 A.L.R. 271). If it be assumed there is no right of contribution between the tort-feasors these decisions are undoubtedly sound. A contrary holding would, in effect, circumvent the prohibition against contribution between tort-feasors.

"However, no reason occurs to us why plaintiff should not have the same right of

contribution its insured had. It is an indemnitor and subrogee of Nickol and, in practical effect, his assignee. Certainly Nickol could legally assign his claim for contribution if he, rather than plaintiff, had paid the Leyendecker claims. Plaintiff's position is no less favorable than that of such an assignee. '* * * it seems manifest that a recognized common-law right of contribution among negligent joint tortfeasors will not be lost merely because of an assignment of that right.' Annotation 60 A.L.R.2d 1366, 1389. See also 13 Am.Jur., Contribution, section 109."

In Peters v. Lyons (1969) (Iowa), 168 N.W.2d 759, the vendee's insurer settled the claim against vendee and intervened in the implied warranty action against defendant Kresge Company. It was assumed without argument that the insurer-subrogee acquired the rights of the insured-subrogor. State Farm Mut. Auto. Ins. Co. v. Anderson-Weber, 252 Iowa 1289, 110 N.W.2d 449, is also similar in this respect.

We hold the insurer-subrogee of the purchaser-user is not a mere member of the general public and may assert the claims of its subrogor.

II. The second major inquiry must concern itself with the sufficiency of the evidence to warrant submission of the implied warranty of fitness count. In considering the propriety of a motion for a directed verdict the evidence must be viewed in the light most favorable to the party against whom the motion was made. Rules of Civil Procedure, rule 344(f) (2).

The truck in question was manufactured on July 24, 1962. It was purchased by Tri-B Corporation on August 15, 1962. The accident occurred May 23, 1964, 21 months after purchase. The truck speedometer showed 31,602 miles of operation at the time.

While the truck was being driven at about 40 to 45 miles per hour on a downhill, concrete highway, it came upon a tractor-wagon unit operated by a local farmer. The driver slowed the truck by use of the brakes to 15 to 20 miles per hour and the brakes worked normally. Oncoming traffic prevented passing and at that time the brakes failed completely. The brake pedal just dropped to the floor. The driver shifted gears and set the emergency brake. The shoulder was wet. The truck struck the rear of the tractor-wagon unit, knocking it into the ditch, causing injuries for which settlement was eventually made.

The truck was licensed for a gross weight of 25,000 pounds. At the time of the accident it weighed 24,000 pounds. Inspection of the truck immediately after the accident, at the scene, indicated the brake pedal went right down to the floor and the right rear wheel on the inside was covered with brake fluid that had run down from the brake drum. The fluid was still dripping when one witness observed the condition. There was no noticeable fluid on the ground under the truck or on the concrete at the point of impact. No one looked back up the hill for traces of oil.

The truck was taken to the O. R. Rucker Ford garage at Harlan, Iowa. It was inspected and repaired by Alvin Hansen who has worked for the same Ford garage for over twenty years. He found there was "no brake pedal at all and no brake fluid in the master cylinder and brake fluid was running out of the right rear wheel onto the tire." He removed the right rear wheel and brake drum. One of the two brake shoes provided for that wheel was worn out and the piston for the brake system was poked out of the well cylinder. This allowed all of the brake fluid to escape.

The mechanic found the right rear brake had no hold down nut or washer where one was supposed to be. On the side of the right rear brake where the hold down nut was missing the brake lining was unevenly and badly worn. It was worn down to the metal of the brake shoe in places and the steel of the brake shoe itself was worn. The lining on the other brake shoe on the same wheel was still good with about 40

percent of the lining intact. Brakes on a truck of this type under very severe use could be expected to last 35,000 to 40,000 miles.

Mr. Hansen testified: "The purpose of the hold down nut is to hold the shoes in line with the drum and holds the shoes on the backing plate. Sort of an anchor I would say. The braking can be activated without the hold down nut being on there. After a certain period of time the absence of the hold down nut wears the one brake shoe out. After it has worn the brake shoe out it wears on it so far that the cylinder comes out and you lose your brake fluid. This does not happen right away.

"Assuming the hold down nut was missing a driver of the truck on an ordinary inspection could not see that this nut was missing."

When both the wheel and the brake drum are pulled off the truck, the brake mechanism, including the hold down nut, is exposed to view. Wheels are not "pulled" in this manner for ordinary brake inspections or for ordinary brake adjustments. The hold down nut is shrunk on one end to hold it in place when it is put on. Ford Motor Company at one time used a different type nut and a cotter key arrangement to insure the nut remained in place but stopped using the cotter key arrangement when this type nut was substituted. The nut goes on the bolt hard, is difficult to remove manually and it is not normal for this nut to come off. There is no reason to remove such a nut, except for the purpose of relining the brakes. The bolt onto which the nut was to be screwed was in good condition, showed no evidence of ever having had a hold down nut on it and accepted a hold down nut when Hansen replaced the one brake shoe and lining. When this was done and the brakes were adjusted, they worked normally.

More detailed recitation of Mr. Hansen's testimony is unnecessary. He concluded: "In my opinion the hold down nut was

gone and that caused the wearing that ultimately caused the break out of the cylinder. I am not now giving the jury any testimony or opinion as to how the hold down nut may have disappeared. Taking into consideration this truck had been on the road about a year and 8 months, about 31,000 miles, I do not feel I would be qualified to say what may have happened to it unless I was completely familiar with all the service and everything that might have been done on that particular truck."

We turn to plaintiff's evidence of purchase, use and servicing of the truck. Robert Emken, President of Tri-B Corporation, bought the truck from Olson Motors, the Ford dealer at Walnut, Iowa. He told the salesman the truck was to be used for hauling dry and liquid fertilizer. The salesman recommended this particular product and Emken says he relied on this representation.

Each of the four or five trucks owned by Tri-B was usually driven by the same driver but there is some shifting in use of the trucks. The trucks are used over paved roads, gravel roads, farm yards and fields. The truck uses two bodies depending on the particular job. Dry fertilizer is hauled and spread. This material is corrosive on metal.

The drivers take care of normal maintenance on the truck such as oil change, greasing and normal maintenance. They make their own driver's inspection. This truck had also been worked on by Olson Motors in Walnut where the unit was purchased. The only other place it would have been worked on was Anderson's Garage at Oakland where Tri-B's mechanic work was usually done. To the president's knowledge, the brake drums on this truck had never been pulled off. Olson Motors never advised Tri-B that the brake drums had been pulled off and never charged Tri-B for such service.

The only work done on the truck which is not fully explained in such manner as to eliminate the conclusion that the brake

drum had been removed occurred at the 1000 mile checkup. The Olson Motor invoice read: "1000 mile check. Adjust brakes. $5.00." Other evidence indicated it was not normal to pull the brake drums when brakes are adjusted.

Mr. Emken concluded: "It's possible the drum could have been pulled on the truck but I doubt very much. We sure would have been charged for it if they had. They always charge us for everything else anyway. * * *"

Mr. Anderson, owner of the other garage that worked on the truck, produced his invoices. On March 3, 1964, he replaced a pair of rear engine mounts and checked the brake system due to a complaint that the brakes worked hard. He inspected the brake system but did not pull the brake drum. He found the trouble to be in the hydrovac, a mechanism designed to deliver energy from the engine to the brake system. A paper cap had been left over a pipe leading to the engine. This should have been removed but was still in place. Anderson removed the cap and replaced the hydrovac and the brake system worked satisfactorily. The hydrovac is near the engine but is not near the wheels or brake drums.

On March 26, 1964 Anderson put a new set of distributors in the motor and replaced a small amount of brake fluid which was lost when he removed the hydrovac and made minor adjustments to the brakes. They then worked satisfactorily.

Tom Kolby, the driver at the time of the accident, testified he had driven the truck since he began working for Tri-B in February 1963 until after the time of the accident. He was the principal driver but others had driven it. To his knowledge the brake drums had never been pulled. Besides the work done at Olson Motors and Anderson Garage, he knew the truck had been worked on at the Ford Garage in Oakland but this was strictly engine work. The brakes did give trouble, they worked awfully hard up until March 1964 when

the truck was worked on at the Anderson Garage. After he received the truck back the brakes worked very well and continued to work well until the time of the accident. Immediately before driving the truck that day he had given it the normal walk-around inspection. He also gave the truck a more thorough inspection, everything visible without tearing the truck apart, whenever he changed the oil and greased the chassis.

There was other evidence produced by cross-examination tending to show the nut could have come off the bolt, been ground up until it was small enough to fall and thus have disappeared. Also, all witnesses admitted it was possible the brake drum could have been pulled off without their knowledge.

■ The burden was on plaintiff to prove by a preponderance of evidence that the brakes were defective when they left Ford's hands. In State Farm Mutual Auto. Ins. Co. v. Anderson-Weber, 252 Iowa 1289, 1302, 110 N.W.2d 449, 456, we said: "By this we do not mean that the mere happening of the event without evidence as to the cause creates a jury question. The burden of showing cause is on the plaintiff, but if he offers evidence from which reasonable minds could reach a conclusion, the question is for the jury. * * * In order to establish a proposition by circumstantial evidence, the evidence must be such as to make the claimant's theory reasonably probable, not merely possible, and more probable than any other theory based on the evidence; but the evidence need not exclude every other possible theory. (Citation)."

For full discussions of the elements inherent in the proximate cause issue see, Federated Mutual Implement and Hardware Insurance Co. v. Dunkelberger (1969) (Iowa), 172 N.W.2d 137 and Adams v. Deur (Iowa), 173 N.W.2d 100 (opinion filed December 9, 1969).

■ We do not decide the facts of existence or nonexistence of a breach of im-

plied warranty or proximate cause. Those conclusions must be reached by the trier of the fact. We conclude plaintiff generated a jury question both on its theory of liability as alleged in Division I and proximate cause.

III. In connection with the issue of sufficiency of evidence defendant emphasizes the age of the truck, 21 months, and its long rough use over 30,000 miles. Ford states: "However, defendants have found no cases where the accident was so remote in point of time and miles from the purchase, the use of the vehicle so severe and the evidence of maintenance and inspection records so lacking as in this case, in which the court has found the evidence sufficient to go to the jury."

■ Time, length of use, severity of use and state of repair are all relevant factors to our inquiry. Hahn v. Ford Motor Co., 256 Iowa 27, 30, 126 N.W.2d 350, notes: "* * * We are not told the age of the vehicle, the number of miles it has been driven or its condition of repair and maintenance. * * *" These factors are germane and important but they are not alone controlling. 1 Frumer and Friedman, Products Liability, section 11.03, pages 211, 212, 214, states: "There may be product failure by reason of natural deterioration resulting from use and lapse of time, even though the manufacturer was not negligent in any respect. 'There is no duty upon a manufacturer to furnish a machine that will not wear out.' However, the majority of the courts have held that prolonged safe use without failure does not foreclose liability as a matter of law. * * *

"Proximity of time and events is, of course, relevant. But, as stated in Pryor v. Lee C. Moore Corp. (10 Cir. 1958), 262 F.2d 673, 'prolonged use of a manufactured article is but one factor, albeit an important one, in the determination of the factual issue whether the negligent manufacture proximately caused the harm.' Thus, in the Pryor case, 15 years of safe use did not foreclose liability for an allegedly defec-

tive derrick weld. There was expert evidence in that case to the effect that properly fused, the weld should have the same useful life as the parent metal."

The authors collect a large number of cases dealing with the problems of lapse of time and type of use of various instruments. The time elements vary from the 15 years mentioned to as short a period as two weeks. Two cases of note are, McKinney v. Frodsham, 57 Wash.2d 126, 356 P.2d 100, where a defectively designed door on a 1955 Volkswagon caused injury in 1957. The court spoke of other tests on the same model car two years after date of manufacture as providing evidence that one out of every four cars was in the same dangerous condition. As to miles traveled on a motor vehicle, in Wallace v. Herman Body Co., 349 Mo. 1093, 163 S.W.2d 923, the court noted evidence that a four month old tractor-trailer unit with 40,000 miles on it was still considered practically new.

We have examined the cases cited by defendant with care. In Hofstedt v. International Harvester Company, 256 Minn. 453, 98 N.W.2d 808, the defect claimed and the expert testimony in support of the claim was based on an examination of the control mechanism on a power take-off made over two years after the accident. More important, the theory of liability was predicated on improper adjustment of brake bands in connection with the mechanism. It was shown that adjustments had been made during the intervening period by persons other than defendants. No evidence, direct or circumstantial, showed the adjustments were not properly made when the product left the factory. Time and continued use were considered as factors but a close reading of the case would indicate the intervening adjustments made by others was crucial. See Grant v. Malkerson Sales, Inc., 259 Minn. 419, 108 N.W.2d 347, 352 (per curiam on rehearing).

As indicated in Division II, there is substantial circumstantial evidence here to show the part containing the claimed defect was not adjusted in such manner as would

affect the defect, the part in question was not available to normal inspection, adjustment or tampering, and the defect, if it existed, would take some time and use before the result which eventuated would occur.

Similarly in Brown v. Ford Motor Company, (1968) 287 F.Supp. 906, 912, the court directed a verdict for defendants. The court noted the car had been driven 11 months and 16,000 miles without complaint as to the steering mechanism. But time and use were not the controlling factors: "These cases are also unusual in that the plaintiffs make no attempt to identify what caused the malfunctioning of the steering mechanism. They, like the plaintiff in United States Rubber Co. v. Bauer (C.C.A. N.D.1963) 319 F.2d 463, 467, offer no proof as to the cause of the failure in the steering mechanism. * * *

"The cause of this accident, the cause of any malfunctioning of the steering mechanism, is, as the plaintiffs concede, uncertain. There is no proof of what in the steering mechanism broke, if it did break, or why. There is no proof of a defect in the steering mechanism, in its materials or workmanship. The plaintiffs themselves offer no explanation for the accident or for the malfunctioning of the steering apparatus. Their expert witnesses profess an inability to fix the cause. No one of them seeks to identify any part of the steering mechanism as defective or to suggest why such mechanism failed to function. Under the testimony of the experts, the unexplained accident may be as reasonably attributed to ordinary 'wear and tear' or to a bump experienced in the normal use of the car as to a failure of one of the some one hundred parts in the steering mechanism. The cause of the accident is, under this record, a matter of surmise, speculation and conjecture." In this case the evidence noted to be missing in Brown v. Ford Motor Company, supra, has been offered. It is for the trier of the facts to assess the weight of such evidence.

Ford Motor Company v. Darryl, Tex. Civ.App., 432 S.W.2d 569, involved brake failure due to a bent push rod on a new truck that had only been driven 600 to 700 miles. There was claimed insufficient evidence to show (1) whether the rod was bent before the accident or by the accident, or (2) was bent by the hard driving given the truck, or (3) was bent when it left the factory. The Texas Court of Civil Appeals held the circumstantial evidence was insufficient to generate a jury question. But as recognized by defendant in the amendment to its brief, the case was reversed by the Texas Supreme Court and judgment of the trial court was affirmed. Darryl v. Ford Motor Co., Tex., 440 S.W.2d 630.

Sharp v. Chrysler Corporation, Tex.Civ. App., 432 S.W.2d 131, 136, also involves claimed defective brakes. The car was three months old and had been driven 1600 miles. This case is particularly interesting because the claimed defect was absence of a spring claimed to be necessary to keep the brake shoes in line. The car itself had been in an accident and had extensive work done on it. But there was no evidence the brake drum had ever been pulled or the internal braking mechanism exposed. In holding a jury question was present, the court said: * * * Where, however, the defect exists inside an encased mechanism or container, absent the establishment of some necessity to invade the mechanism, the inference is that the defective condition existed at the time of the manufacture or assembly. The fact that the unit is encased protects the inference and authorizes a valid conclusion by a jury that the defect existed at the crucial time. This is not to suggest that as a matter of law the complaining party is entitled to a verdict in his favor, but only that the jury may draw an inference that the defective condition existed at the time possession and control was surrendered by the manufacturer of the product. See Prosser, The Fall of the Citadel, 50 Minn.Law Rev. 791, 846–847 and cases cited; LeBlanc v. Ford Motor Co.,

supra, 346 Mass. 225, 191 N.E.2d [301,] p. 305 [, 6 A.L.R.3d 83.]."

Roach-Bissonnet, Inc. v. Puskar, Tex., 417 S.W.2d 262, involved steering mechanism on a car with less than 1000 miles operation and less than 30 days use. The problems presented did not involve long continued use but rather whether false representations by the manufacturer obviated the necessity of showing a defect when the car left the hands of the manufacturer. See Restatement, Second, Torts, section 402 B.

▉ We hold age and type of use of a product are relevant factors to be considered in products liability cases of this type but they are relevant factors for the trier of the facts. Only in rare cases, or in absence of other proofs, are they controlling as a matter of law. Fredericks v. American Export Lines, (2 Cir. Medina, J.), 227 F.2d 450.

▉ IV. Defendant argues failure of plaintiff to introduce evidence on the subject of damages also constituted a fatal deficiency in the evidence. Plaintiff alleged *and defendant admitted* the prior judgment against plaintiff in the amount of $20,902.30 and settlement of the case by payment of $17,500 plus $249.13 costs. Additional evidence certainly would have been germane and advisable but the admitted facts of judgment, settlement and payment of the settlement are sufficient evidence of reasonableness for jury consideration. The situation is not unlike the admissibility of medical bills which have been paid. In Lawson v. Fordyce, 237 Iowa 28, 21 N.W.2d 69, 82, we held "the fact of payment alone is sufficient to carry the question of reasonableness to the jury."

▉ Ford argues the amount found by the former jury and the amount of settlement are not binding on it. We agree. That isn't the question where the court directs a verdict. Defendant will have its opportunity to contest these amounts at a full trial.

V. Plaintiff also complains of the court's action striking the count based on the theory of active and passive negligence. The court felt our observations in Hawkeye-Security Co. v. Lowe, supra and Iowa Power and Light Co. v. Abild Construction Co., supra, indicated an intention to reject the entire active versus passive negligence rationale for seeking indemnity.

We criticized the rationale in both cases but did not repudiate the doctrine. The active-passive negligence doctrine has been recognized under appropriate circumstances in Peters v. Lyons, (1969) (Iowa), 168 N.W.2d 759 and Federated Mutual Implement and Hardware Ins. Co. et al. v. Dunkelberger, supra. However, a majority of the court concludes the evidence in this case would not have justified submission of this count to the jury. In light of our rulings on the other theories espoused we deem it unnecessary to pursue the matter further and affirm the trial court on this issue.

▉ VI. The evidence discussed in Divisions II and III would not in itself be sufficient to generate a jury question on the issue of alleged negligence of Ford in connection with the claim for contribution. There is no showing as to just what Ford did or did not do. However, the interrogatories and answers addressed to Ford were offered and admitted in evidence. The jury could find from this evidence that Ford made no inspection to determine whether the brakes were properly assembled. We quote two of Ford's answers:

"4. As Defendant will point out in greater detail in subsequent answers, Defendant relied on the manufacturing capability of Kelsey-Hayes Company to produce brake assemblies of good manufacture, with proper materials and workmanship and the kind of quality control procedures which would insure against the possibility of error. Defendant's inspection would therefore have been limited to any incidental observance by the assembler even though he

had no formal duties in connection therewith. * * *

"18. Defendant relies on the Kelsey-Hayes Company to carry out its manufacturing operations with a recognition of the essentiality of a total Quality Control Program which will insure against that supplier providing Ford Motor Company with any parts not fit for the purpose of use and not meeting the onerous standards of quality applicable to brake components. Defendant's custom and practice as to inspections takes into account Defendant's utter reliance on supplier performance as set forth above and therefore, there is no specific requirements by Defendant to inspect said assemblies other than as described in earlier answers."

In Bengford v. Carlem Corporation, Iowa, 156 N.W.2d 855, 864, we said: "The general rule as to liability of a manufacturer of a chattel is that a manufacturer who fails to exercise reasonable care in the manufacture of a chattel which, unless carefully made, he should recognize as involving an unreasonable risk of causing substantial bodily harm to those who lawfully use it for a purpose for which it is manufactured and to those whom the supplier should expect to be in the vicinity of its probable use, is subject to liability for bodily harm caused to them by its lawful use in a manner and for a purpose for which it is supplied. The stated rule is found in Restatement Torts, both first and second, section 395. * * *." See also, Annotation, Products Liability-Product Component, 3 A.L.R.3d 1016; Rauch v. American Radiator and Standard Sanitary Corp., 252 Iowa 1, 104 N.W.2d 607.

The answers to interrogatories, coupled with the other evidence offered by plaintiff, supplied enough evidence to go to the jury on one or more of the plaintiff's specifications of negligence in the contribution division.

VII. Plaintiff's third contention in connection with its claim for indemnity concerns the court's dismissal of the claim for indemnity predicated on strict liability in tort.

Although Professor Prosser's article "The Fall of the Citadel" (Strict Liability to the Consumer), 50 Minn.Law Rev. 791, includes Iowa as a state which has adopted strict liability in tort, we think State Farm Mutual Auto. Ins. Co. v. Anderson-Weber, Inc., supra, does not have the effect Professor Prosser claims for it. State Farm Mutual Auto. Ins. Company was predicated on breach of implied warranty. In Tice v. Wilmington Chemical Corp., 259 Iowa 27, 141 N.W.2d 616, we again discussed the principle but did not adopt it for products other than unwholesome foods. In both cases such action was unnecessary to the decision.[2]

We are now squarely faced with the proposition. If this case is to be retried plaintiff has a right to plead and prove strict liability in tort as a theory for recovery if such theory is predicated on principles acceptable to the Iowa courts. The trial court held the issue had not yet been squarely decided and therefore dismissed the count.

Because so much has been written on this subject we hesitate to write more. However, it is necessary to consider the history and extent of the concept, at least briefly. As indicated in Tice v. Wilmington Chemical Corp., supra, the products liability concept was first accepted in the unwholesome food cases. The Iowa case cited is Davis v. Van Camp Packing Co., (1920), 189 Iowa 775, 176 N.W. 382, 17 A.L.R. 649.

2. In deference to Professor Prosser, we should note the reasoning in cases cited infra does not differ markedly from our own, State Farm Mutual Auto. Ins. Co. v. Anderson-Weber, 252 Iowa 1289, 1301, 110 N.W.2d 449, 456: "Brakes should not be defective from the beginning. Steering mechanism should not fail, nor cars burn up within 10 days. When such things happen and there is evidence as to the cause, courts should be reluctant to deny the purchaser the right to submit his claim to a jury."

The concept of strict liability in tort as applied to other cases probably had its genesis in such writings as Justice Traynor's special concurrence in Escola v. Coca Cola Bottling Co., (1944), 24 Cal.2d 453, 150 P.2d 436, 440 and Prosser, Law of Torts, Second Ed., § 84, page 510, and is fully developed in Greenman v. Yuba Power Products, Inc., (1963), 59 Cal.2d 57, 27 Cal. Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049, which is followed by a lengthy annotation on the subject at 13 A.L.R.3d 1057.

The early leading majority opinion adopting the principle is Henningsen v. Bloomfield Motors, Inc., (1960), 32 N.J. 358, 161 A.2d 69, 75 A.L.R.2d 1. Development of the principle since Henningsen is traced by Professor Prosser in The Fall of the Citadel, supra.

Restatement, Second, Torts, § 402A provides: "Special Liability of Seller of Product for Physical Harm to User or Consumer:

"(1) one who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

"(a) the seller is engaged in the business of selling such a product, and

"(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

"(2) The rule stated in Subsection (1) applies although

"(a) the seller has exercised all possible care in the preparation and sale of his product, and

"(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

Rather than attempt a lengthy restatement of the reasons for adopting the strict liability in tort principle we quote from three jurisdictions: Greenman v. Yuba Power Products, Inc., supra, (27 Cal.Rptr. loc. cit. 700, 377 P.2d loc. cit. 900, 13 A.L.R. 3d loc. cit. 1054): "Moreover, to impose strict liability on the manufacturer under the circumstances of this case, it was not necessary for plaintiff to establish an express warranty as defined in section 1732 of the Civil Code. A manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being. Recognized first in the case of unwholesome food products, such liability has now been extended to a variety of other products that create as great or greater hazards if defective. (citations)

"Although in these cases strict liability has usually been based on the theory of an express or implied warranty running from the manufacturer to the plaintiff, the abandonment of the requirement of a contract between them, the recognition that the liability is not assumed by agreement but imposed by law (citations), and the refusal to permit the manufacturer to define the scope of its own responsibility for defective products (citations) make clear that the liability is not one governed by the law of contract warranties but by the law of strict liability in tort. Accordingly, rules defining and governing warranties that were developed to meet the needs of commercial transactions, cannot properly be invoked to govern the manufacturer's liability to those injured by their defective products unless those rules also serve the purposes for which such liability is imposed.

"We need not recanvass the reasons for imposing strict liability on the manufacturer. They have been fully articulated in the cases cited above. The purpose of such liability is to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves. Sales warranties serve this purpose fitfully at best. * * *"

The Illinois Supreme Court in Suvada v. White Motor Co., 32 Ill.2d 612, 210 N.E.2d 182, 186: "Recognizing that public policy is

the primary factor for imposing strict liability on the seller and manufacturer of food in favor of the injured consumer, we come to the crucial question in this case, namely, is there any reason for imposing strict liability in food cases and liability based on negligence in cases involving products other than food. Arguments advanced to support the imposition of strict liability in food cases have been: (1) The public interest in human life and health demands all the protection the law can give against the sale of unwholesome food. (Wiedeman v. Keller, 171 Ill. 93, 49 N.E. 210.) (2) The manufacturer solicits and invites the use of his product by packaging, advertising or otherwise, representing to the public that it is safe and suitable for use. Having thus induced use of the product, the law will impose liability for the damage it causes. (Patargias v. Coca-Cola Bottling Co., 332 Ill.App. 117, 74 N.E.2d 162.) (3) The losses caused by unwholesome food should be borne by those who have created the risk and reaped the profit by placing the product in the stream of commerce. (See Wiedeman v. Keller, 171 Ill. 93, 49 N.E. 210.) Without extended discussion, it seems obvious that public interest in human life and health, the invitations and solicitations to purchase the product and the justice of imposing the loss on the one creating the risk and reaping the profit are present and as compelling in cases involving motor vehicles and other products, where the defective condition makes them unreasonably dangerous to the user, as they are in food cases."

Santor v. A & M Karagheusian, Inc., 44 N.J. 52, 207 A.2d 305, 313, 16 A.L.R.3d 670, states: "Under the strict liability in tort doctrine, as in the case of express or implied warranty of fitness or merchantability, proof of the manufacturer's negligence in the making or handling of the article is not required. If the article is defective, i. e., not reasonably fit for the ordinary purposes for which such articles are sold and used, and the defect arose out of the design or manufacture or while the article was in the control of the manufacturer, and it proximately causes injury or damage to the ultimate purchaser or reasonably expected consumer, liability exists. Existence of the defect means violation of the representation implicit in the presence of the article in the stream of trade that it is suitable for the general purposes for which it is sold and for which such goods are generally appropriate. As we have said, this representation is found in the law. If it is not a fact—if the article is defective and the defect is chargeable to the manufacturer, his must be the responsibility for the consequent damage or injury. The liability does not depend on traditional requirements for proof of legal or equitable fraud. Considerations of good faith or innocence of the representation or wilfulness of the misrepresentation are immaterial to existence of the cause of action. See 64 Colum.L.Rev., supra, at p. 936."

We now adopt the principles found in Restatement, Second, Torts, § 402A and the reasoning found in the cases herein quoted. Our discussion of the evidence in Division III indicates plaintiff would have generated a jury question on the theory of strict liability in tort had it been allowed to remain in the case.

VIII. We held both implied warranty and strict liability in tort were properly pled and there was substantial evidence to support submission of each of them to the jury. This does not mean both theories had to be submitted to the jury as a matter of right. This depends on the facts of each case. Ordinarily strict liability in tort is in lieu of one or more of the implied warranty theories.[3] Such a warranty theory should not necessarily

---

3. It has been argued that strict liability in tort "is nothing but the old familiar concept of warranty—which, of course, was always a doctrine of strict liability—but divested of the contractual trappings * * * which surrounded the warranty concept." Strict Liability in Torts, The Road To And Past Vandermark, 38 So. Cal.L.Rev. 30, 46.

be submitted with a strict liability in tort theory. We do not foreclose fact situations where both theories should be submitted but recognize such a situation would be exceptional.

The Divisions dealing with negligence is a different matter. 2 Frumer and Friedman, Products Liability, § 16A(2), page 3–178, states: "While it was considered 'simpler' to regard the liability stated as strict liability in tort, the section is *not* exclusive. It does not preclude liability based on the alternative ground of negligence, when negligence can be proved." See also Restatement, Second, Torts, 402A, Comment (a).

■ IX. What has been said in Division II and III as to sufficiency of evidence to generate a jury question on the indemnity claim is applicable to the directed verdict on the concurrent negligence count. We hold there was sufficient evidence to go to the jury on the contribution issue.

■ X. Ford points to the finding by the jury in the case of Koppold v. Kolby and particularly the answers to interrogatories found in the record of that case. We are asked to take judicial notice of those records. We do not take judicial notice of records in another case tried in the same court. Bales v. Iowa State Highway Comm., 249 Iowa 57, 86 N.W.2d 244. The case cited by defendant, Dobler v. Bawden, 238 Iowa 76, 85, 25 N.W.2d 866, is not in point. There we referred to a prior printed opinion of this court and took judicial notice of the printed record on which the opinion was based. This is not the same situation.

Since this case is remanded for retrial, the point may well come up under a different record or in a different context. We therefore do not pass on this phase of the case at this time. A new trial is ordered.

Reversed and remanded.

MOORE, C. J., and SNELL, STUART and RAWLINGS, JJ., concur.

LeGRAND, LARSON and MASON, JJ., dissent.

REES, J., takes no part.

LeGRAND, Justice (dissenting):

I dissent from the result reached by the majority opinion and would affirm the trial court.

Although our eventual acceptance of the rule of strict tort liability has been foreshadowed at least since State Farm Mutual Auto Insurance Co. v. Anderson-Weber, 252 Iowa 1289, 110 N.W.2d 449, the present case is our first direct approval of that principle. I agree with the doctrine but challenge its application to the record now before us.

The facts set out in the majority opinion show plaintiff seeks indemnity or contribution from Ford Motor Co., alleging Ford had sold plaintiff's insured a truck with faulty brake assembly. This defect, it is claimed, later caused an accident for which plaintiff was compelled to pay $17,500.00. It is this amount plaintiff seeks to recover.

Plaintiff's entire case depends upon the existence of evidence from which a jury could find a small hold-down nut was missing from the brake assembly at the time the vehicle left the Ford factory. There is no such evidence, either direct or circumstantial.

The testimony shows a brake failure some 21 months and 31,602 miles after the sale of the truck to plaintiff's insured. During that interval it had been subjected to rigorous use hauling dry and liquid fertilizer over good roads and bad and through farm yards and fields.

Examination of the brakes immediately after the accident disclosed the absence of a small hold-down nut. It is conceded this

nut is important to the proper adjustment and long-term operation of the brakes.

The only evidence concerning the nut is that it was not present after the accident. No witness was able to say how long the nut had been missing nor if, indeed, it had ever been on at all. Plaintiff's expert refused to speculate on either of these matters.

Plaintiff's case is entirely circumstantial. Such evidence must establish its theory as "reasonably probable, not merely possible, and more probable than any other theory based on the evidence." State Farm Mutual Auto Insurance Co. v. Anderson-Weber, supra, 252 Iowa 1289, 1302, 110 N.W.2d 449, 456. It need not, however, exclude every other possible theory.

The majority relies on this pronouncement in saying the jury should have been permitted to say the elusive nut was not in place on July 24, 1962, (the date of manufacture) because it was missing on May 23, 1964 (the date of the accident). The detail which is said to justify this is the fact that the presence or absence of the nut could be determined only by removing the entire brake drum and there is no evidence this was ever done.

I believe this view authorizes a jury to find negligence by resort to speculation and surmise. The facts here afford no basis upon which Ford could be found negligent in the manufacture of the truck. The vehicle had been in constant service for almost two years; it had been driven almost 32,000 miles under demanding conditions; it had been worked on by several garages from time to time; it is admittedly impossible to tell when or how the nut was lost; it is conceded the brakes had used up almost 90 percent of the life of a

perfect system; it is shown the brake system had been worked on by several mechanics prior to the accident; it appears from the evidence the nut could have been lost or destroyed after the vehicle left the factory; and it is clear the nut could have been lost or destroyed in the accident itself.

All this belies the claim that plaintiff's evidence makes its theory "reasonably probable" or "more probable than any other theory based on the evidence."

Admittedly plaintiff's burden of proof in establishing negligence at a remote time and place is a difficult one. However, in adopting the rule of strict liability and extending to plaintiff an additional theory of recovery, we should not also forfeit the fixed rights of defendant. One of these is that plaintiff must prove negligence as in any other case.

The cases reviewed by the majority do not support the result reached. Most of them, like Pryor v. Lee C. Moore Corp., (10 Cir.), 262 F.2d 673, and McKinney v. Frodsham, 57 Wash.2d 126, 356 P.2d 100, involve defects—one a faulty design and the other a weak weld—which could be positively demonstrated after a long period of time. In Wallace v. Herman Body Co., 349 Mo. 1093, 163 S.W.2d 923, the offending vehicle was only four months old. No authority cited is comparable to the one before us.

I think this is a poor set of facts to mark our first venture into the area of strict tort liability. It comes perilously close to espousing liability without fault.

LARSON and MASON, JJ., join in this dissent.